[No. S055682. Aug. 14, 1997.]

VENTURA COUNTY DEPUTY SHERIFFS' ASSOCIATION et al.,
Plaintiffs and Appellants, v.
BOARD OF RETIREMENT OF VENTURA COUNTY EMPLOYEES'
RETIREMENT ASSOCIATION, Defendant and Respondent;
COUNTY OF VENTURA, Real Party in Interest and Respondent.

**COUNSEL**

Silver, Shaeffer & Hadden, Stephen H. Silver and Susan Silver for Plaintiffs and Appellants.

Carrol, Burdick & McDonough and Christopher D. Burdick as Amici Curiae on behalf of Plaintiffs and Appellants.

James L. McBride, County Counsel, Dennis L. Slivinski and Andrew B. Gustafson, Assistant County Counsel, for Defendant and Respondent and for Real Party in Interest and Respondent.

## OPINION

**BAXTER, J.**—Ventura County employees receive retirement benefits (pensions) under a retirement system established pursuant to the County Employees Retirement Law of 1937 (CERL) as codified in 1947. (Gov. Code, § 31450 et seq.)[1] The amount of a pension is based in part on the earnings of the retiree during a selected three-year period or one-year period prior to retirement. In Ventura County the one-year period is used in calculating pensions. We are asked to decide whether various payments by the county over and above the basic salary paid to all employees in the same job classification are "compensation" within the meaning of the statute which defines compensation (§ 31460), and, if so, whether those payments are also "compensation earnable" (§ 31461) and thus part of a retiring employee's "final compensation" (§ 31462 or 31462.1) for purposes of calculating the amount of a pension.

Plaintiffs, an employee association and three retired employees, contend that the Court of Appeal erred in holding that only those bonuses, incentives, and other forms of compensation that are paid uniformly to all employees in a job classification are "compensation earnable." Defendant retirement board and real party in interest Ventura County (hereafter referred to jointly as the county) disagree and also contend that the Court of Appeal erred in holding that the county's contribution to an employee's deferred compensation plan is "compensation earnable."

After considering the language and legislative history of the pertinent CERL provisions, we conclude that the Legislature did not intend to require that a county include its contributions to an employee's deferred compensation plan in "compensation" as defined in CERL. We also conclude, however, that the other disputed premiums are "compensation." With the exception of overtime pay, items of "compensation" paid in cash, even if not earned by all employees in the same grade or class, must be included in the "compensation earnable" and "final compensation" on which an employee's pension is based.

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

We shall, therefore, reverse the judgment of the Court of Appeal.

## I

### Background

Pursuant to a 1992 memorandum of agreement with plaintiff association, from July 19, 1992, to July 15, 1995, the relevant time period, the county paid qualifying members of the association, in cash, bilingual premium pay,[2] a uniform maintenance allowance,[3] educational incentive pay,[4] additional compensation for scheduled meal periods for designated employees,[5] pay in lieu of annual leave accrual,[6] holiday pay,[7] a motorcycle bonus,[8] and a field training officer bonus.[9] During the same period, the three individual plaintiffs were subject to a resolution fixing the wages, hours, and terms of

---

[2]Employees assigned to positions requiring the use of bilingual skills were to be compensated by a premium in addition to their base pay at rates initially set at 50 cents per hour and then in ranges of 65 cents, 80 cents, or 90 cents per hour based on their level of proficiency, not to exceed 80 hours per pay period.

[3]A total annual uniform maintenance allowance of $675 was to be paid in the first pay period of each November.

[4]Educational incentive pay was given to employees possessing an intermediate or advanced Peace Officer Standards and Training (POST) certificate who had five years of law enforcement experience in a POST-accredited California law enforcement agency and met other criteria. The additional pay ranged from $77.74 to $172.71 biweekly, depending on the level of certification, the employee classification, and the time period. Employees classified as "sheriff's pilot" who met experience, pilot certification, and salary criteria were also entitled to educational incentive pay.

[5]Deputy sheriffs and senior deputy sheriffs assigned to patrol divisions, pilots, and crew chiefs, were to receive $60 biweekly in lieu of overtime for meal periods during which they were subject to call. The county has agreed that this item is furnished uniformly to all employees classified as sheriff's pilots and therefore "compensation earnable." It is no longer in dispute as to those employees. As a result of this concession, this pay is included for purposes of computing the pension of an employee who served as a sheriff's pilot during the applicable period, but the identical amount is not included in computing the pension of a deputy sheriff, senior deputy sheriff, or sergeant.

[6]After using a specified minimum days of annual leave, an employee could elect to receive pay in lieu of up to 40 hours of annual leave accrual and on accruing 400 hours could elect to be paid for another 40 hours.

[7]Employees on a four-day-on, two-day-off schedule were to receive cash payments equal to the value of 50 percent of the number of hours normally worked on a regular day for an assigned holiday that fell on a regularly scheduled workday. When other employees worked on a holiday falling on a regularly scheduled workday, they were to receive a cash payment of pay for one and one-half times the number of hours actually worked on the holiday in addition to payment for the number of hours normally worked by the employee on a regularly scheduled workday. Provision also was made for cash payment when an assigned holiday fell on a regularly scheduled day off.

[8]The motorcycle bonus was $20 per pay period.

[9]Deputy sheriffs in class No. 00550 designated as field training officers were to receive $8 per shift when a trainee or deputy was assigned to them and they actually performed training-related duties.

employment of management, confidential clerical, and other unrepresented employees. As such they were entitled to cash payments for a uniform maintenance allowance,[10] a longevity incentive,[11] pay in lieu of annual leave accrual,[12] and matching deferred compensation payments.[13]

When the county refused to include the cash payments agreed to in the memorandum of agreement and the resolution in computing employees' "final compensation" upon which their pensions were based, plaintiffs initiated this mandamus proceeding (Code Civ. Proc., § 1085) by which they sought to compel recalculation of their pension rights based on a computation of "compensation," "compensation earnable," and "final compensation" which did include these cash payments. The superior court denied the petition without a statement of decision, none having been requested, and plaintiffs appealed.

The Court of Appeal, relying in part on *Guelfi* v. *Marin County Employees' Retirement Assn.* (1983) 145 Cal.App.3d 297 [193 Cal.Rptr. 343] (*Guelfi*), agreed with the implicit conclusion of the trial court that none of the premiums identified by the association constituted compensation that had to be included in calculating pensions, but held that the county's matching deferred compensation payments were includable compensation. It therefore "affirmed" the judgment of the superior court and "remanded" the matter to the retirement board for recalculation of the retirement benefits of the three individual plaintiffs.[14]

This court granted petitions for review by both plaintiffs and defendants.

The county argues that the Court of Appeal erred in reading a 1995 amendment of section 31461 which provided that deferred compensation

---

[10]This annual uniform maintenance allowance was $520.

[11]Employees in this category with five years of county service were entitled to a lump sum annual leave credit for eight hours per year for each year of service, not to exceed one hundred four hours. The credits could be accrued as annual leave or taken in the form of additional compensation.

[12]The annual leave redemption differed in the number of hours that had to be used and in the amount that could be redeemed, but like that of employees subject to the memorandum of agreement, was elective.

[13]For these employees the county agreed to match employee contributions to a deferred compensation plan in percentages ranging from a 100 percent match when an employee deferred 1 percent of salary to a 50 percent match when the employee deferred 6 percent or more of salary.

[14]Since the question arose on petition for writ of mandate which the trial court had denied, we deem this to have been an order reversing the superior court judgment and directing that court to issue a peremptory writ of mandate ordering the board to include the county contributions to those plaintiffs' deferred compensation plan in its calculation of their pensions.

was to be deemed "compensation earnable" in the year earned rather than the year paid as recognition that matching contributions to an employee's deferred compensation plan constituted "compensation earnable." The parties had agreed that the amendment did not change the law, but the county contends that matching funds were never "compensation earnable" under section 31461.

Plaintiffs contend that both the *Guelfi* court and the Court of Appeal in this case erred in their construction of sections 31460 and 31461, and in doing so ignored legislative history which reflects intent that all of the claimed cash payments be included in the "final compensation" on which county employee pensions are calculated under CERL.

II

*Statutory Definitions and the Guelfi Construction*

The payments required by CERL to be included in the calculation of the pension of an employee whose county employer has elected to establish a retirement system governed by CERL presents a question of statutory construction, and thus legislative intent. Under CERL an employee's pension is a combination of a retirement annuity based on the employee's accumulated contributions supplemented by a pension established with county contributions sufficient to equal a specified fraction of the employee's "final compensation." (See, e.g., §§ 31664, 31676.1.) Other provisions of CERL limit the amount of employee pensions to a percentage of (see, e.g., § 31664.5), or not more than (see, e.g., § 31676.1), the employee's "final compensation."

Which payments to a county employee other than base pay must be included when determining an employee's final compensation is a question crucial to the proper administration of a CERL pension system, including the ability of the county to anticipate and meet its funding obligation. We necessarily begin our analysis with the definitions in CERL, as those definitions govern construction of CERL unless the context otherwise requires. (§ 31455.) ▮ Any ambiguity or uncertainty in the meaning of pension legislation must be resolved in favor of the pensioner, but such construction must be consistent with the clear language and purpose of the statute. (*Guelfi, supra,* 145 Cal.App.3d at p. 303; *Rose* v. *City of Hayward* (1981) 126 Cal.App.3d 926, 940 [179 Cal.Rptr. 287]; *Neeley* v. *Board of Retirement* (1974) 36 Cal.App.3d 815, 822 [111 Cal.Rptr. 841].)

A.  *"Compensation"*

Section 31460 defines "compensation" as "the remuneration paid in cash out of county or district funds, plus any amount deducted from a member's

wages for participation in a deferred compensation plan . . . but does not include the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member."

### B. "Compensation earnable"

Under section 31461, " '[c]ompensation earnable' by a member means the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay. The computation for any absence shall be based on the compensation of the position held by the member at the beginning of the absence. . . ."

Amendments to section 31461 in 1993 and 1995, which the parties agree were not intended to make any substantive change in that definition added: "Compensation, as defined in Section 31460, that has been deferred shall be deemed 'compensation earnable' when earned, rather than when paid."

### C. "Final compensation"

Section 31462.1, which applies in Ventura County, defines "final compensation" as "the average annual compensation earnable by a member during any year elected by a member at or before the time he files an application for retirement, or, if he fails to elect, during the year immediately preceding his retirement."

These definitions were construed and applied by the Court of Appeal in *Guelfi,* in which two retired peace officers claimed that their disability retirement pensions should be calculated on the basis of preretirement earnings including overtime, educational incentive pay, and a uniform allowance. Pursuant to section 31727.4, the amount of a peace officer's service-connected disability retirement, like a longevity retirement, is based on the employee's "final compensation."

The *Guelfi* court first concluded that a uniform allowance is among the "other advantages furnished to a member" which are excluded from "compensation" by section 31460. (145 Cal.App.3d at p. 304.) The court noted that a uniform allowance had been held to fall within the term "other advantages" as used in section 20022, a part of the Public Employees' Retirement Law (§ 20000 et seq.) because the uniform was a substitute for other personal attire which an employee must normally furnish at the employee's own expense. (*Guelfi, supra,* 145 Cal.App.3d at p. 304, citing

*Rose* v. *City of Hayward, supra,* 126 Cal.App.3d at p. 943.) Educational incentive pay, by contrast, was remuneration for training that benefited the employer and thus did constitute "compensation" within the definition of section 31460. (145 Cal.App.3d at p. 304.)

The Court of Appeal then considered whether the payment was "compensation earnable" within the meaning of section 31461, since, under section 31462.1, only "compensation earnable" is part of the "final compensation" on which a pension is calculated, and held that it was not. The court reasoned that not all employees in the same grade or class of positions qualified for educational incentive pay. Therefore, if that pay were to be included in "compensation earnable," not all employees in a class could be said to receive the same rate of pay and section 31461 provided that "compensation earnable" was to be based on " 'the average number of days ordinarily worked by persons in the *same grade or class of positions . . .* and at the *same rate of pay. . . .* ' " (*Guelfi, supra,* 145 Cal.App.3d at p. 304, italics added.) Similar reasoning led the court to conclude that overtime pay was not "compensation earnable." (*Id.* at p. 305.)[15] The court concluded that the Legislature's reference to "days" ordinarily worked by other employees in the same class, rather than "hours" suggested that "compensation earnable" contemplated the average standard work week of employees in the class, and not additional overtime hours. (*Id.* at p. 306.) The retirement board was free to include those benefits in its retirement calculation if it elected to do so, but CERL did not require that they be included. (*Id.* at p. 307, fn. 6.)

### III

#### *"Compensation" and "Compensation Earnable" in CERL*

The function of the court in construing a statute "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.) "If there is no ambiguity in the language of the statute, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' " (*Lennane* v. *Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].) Therefore, if a statute is unambiguous, it must be applied according to its terms. Judicial construction is neither

---

[15]Because the court found the language of section 31461 clear and unambiguous, it was not necessary to consider statutes that are part of the Public Employees' Retirement Law and the State Teachers' Retirement Law (former § 20025.2 (now § 20635); Ed. Code, § 22114, subd. (b)), which expressly exclude overtime pay in calculating pensions.

necessary nor permitted. When statutory construction is necessary, the court's primary responsibility is to carry out the intent of the Legislature to the extent possible. (Code Civ. Proc., § 1859; *People* v. *Wells* (1996) 12 Cal.4th 979, 985 [50 Cal.Rptr.2d 699, 911 P.2d 1374]; *Parris* v. *Zolin* (1996) 12 Cal.4th 839, 845 [50 Cal.Rptr.2d 109, 911 P.2d 9].)

■ As this case and *Guelfi* reflect, both section 31460 and section 31461, the proper construction of which is at the heart of this dispute, are ambiguous in some respects. Section 31460 specifies that "remuneration paid in cash" is "compensation" while the monetary value of board, lodging, fuel, and laundry is not to be considered "compensation." It does not specify whether remuneration not ordinarily paid in cash, such as accrued vacation, becomes "compensation" when the employee elects to receive cash in lieu of the in-kind remuneration, and does not identify or define the other in-kind "advantages" that are to be excluded from "compensation." Finally, section 31460 specifies that deferred compensation deducted from an employee's wages is "compensation," but neither section 31460 nor any other statute indicates whether a county's matching contributions to a deferred compensation plan are "compensation."

Section 31461, in turn, fails to specify whether, assuming cash payments for advantages ordinarily furnished in kind are "remuneration paid in cash" within the meaning of section 31460, they and employer contributions to employees' deferred compensation plans are to be considered in determining the "compensation earnable" of a retiring employee. It also fails to specify if "average compensation . . . [computed] upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay" contemplates inclusion of only the base pay for those positions or requires either that all "compensation" to all employees in the same grade or class of positions is to be included in determining the employee's "average compensation" or if the "average compensation" is that of the individual retiring employee, including all nonexcluded cash payments, but computed over the average number of days worked by all employees in the employee's grade or class for the period on which the individual employee's retirement pay is based. We therefore disagree with the *Guelfi* court and the Court of Appeal here that the meaning of sections 31460 and 31461 is clear.

We agree with *Guelfi* that there is a logical progression in the statutory framework under which a pension is calculated. Application of section 31460 is the first step, since an item must meet its broad definition of "compensation" if it is also to fall within the narrower category of "compensation earnable" defined in section 31461 and thus form the basis for the

calculation of "final compensation" on which the pension is based pursuant to section 31462 or 31462.1.

### A. "Compensation"

Before any payment qualifies as "compensation earnable," the payment must be "compensation" within the meaning of section 31460. To constitute "compensation," a payment must be "remuneration" which is not excluded from "compensation" by that section. The Legislature has specified that " '[c]ompensation' means the remuneration paid in cash [and] any amount deducted from a member's wages for participation in a deferred compensation plan . . . ."

### 1. County contributions to deferred compensation

■ Section 53213 permits a county to establish a deferred compensation plan for its employees. Under such a plan, which postpones payment of income taxes until the funds are received, a portion of the current wages of a participating employee is deducted, invested and paid at the time of retirement. Section 53214 provides that "[n]otwithstanding any other provision of law, a participant in a deferred compensation plan may also participate in a public retirement system, and, in ascertaining the amount of compensation of such participant for purposes of computing the amount of his contributions or benefits under a public retirement system, any amount deducted from his wages pursuant to this article shall be included." Section 31460 provides in turn that the "amount deducted from a member's wages for participation in a deferred compensation plan" is to be treated as part of the employee's "remuneration paid in cash," and section 31461 provides that "[c]ompensation as defined in Section 31460, that has been deferred shall be deemed 'compensation earnable' when earned, rather than when paid." None of these statutes address the status of the county's contribution to an employee's deferred compensation plan. Moreover, insofar as deferred compensation is concerned, the Legislature has adopted a restrictive definition of "compensation" in section 31460. That section provides that an "amount deducted from a member's wages for participation in a deferred compensation plan" is "compensation." That definition leaves no room for inclusion of any contributions to a deferred compensation plan that are not deducted from a member's wages. Section 31460 recognizes that but for the employee election to defer payment of those wages, they would be "remuneration paid in cash" as part of the employee's regular wages. That cannot be said of a county contribution to an employee's deferred compensation plan.

The Legislature added reference to deferred compensation to the predecessor of section 31460 and enacted section 53214 in 1972 as part of the

legislation which permitted counties to create a deferred compensation program. (Former § 18310, added by Stats. 1972, ch. 1370, §§ 5, 10, 11, pp. 2734-2736.) Section 53214 makes it clear that the Legislature had in mind the computation of county employee pensions when reference to deferred compensation was added to section 31460 in 1972. It again had the subject in mind when reference to deferred compensation was added to section 31461 in 1993. Yet none of these sections provide that any funds added to a deferred compensation plan other than funds deducted from the employee's wages are to be considered in computing a pension. The references to deferred compensation in sections 31460 and 31461 make it clear that the deferred funds, which clearly would have been "compensation" if paid in the normal course, do not lose that status for pension purposes even though they had not been received by the employee at the time the pension was calculated. The omission of any reference to county contributions to employees' deferred compensation plans compels a conclusion that the Legislature did not consider those contributions to be "compensation" and did not intend to mandate inclusion of any county contribution to an employee's deferred compensation plan in the "compensation" on which the employee's pension is computed.

### 2. *Other cash payments*

When section 31460 was enacted in 1947, it provided: " 'Compensation' means the remuneration paid in cash out of county or district funds . . . plus the monetary value . . . of board, lodging, fuel, laundry, and other advantages furnished to a member in payment for his services." (Stats. 1947, ch. 424, § 1, p. 1264.) It appears from this that the Legislature considered the type of in-kind advantages identified in section 31460 to be "remuneration" if they were provided to an employee in payment or partial payment for the employee's services. Since both cash wages and the value of in-kind "advantages" such as room, board, laundry and fuel were remuneration, both were to be included in "compensation" for purposes of determining pension benefits. In 1951, however, section 31460 was amended to provide that the monetary value of those items and other advantages was not to be included in "compensation" for this purpose.

Plaintiffs argue that section 31460 now permits exclusion only of the monetary value of advantages furnished in kind and that the exclusion for the monetary value of in-kind advantages is not applicable to cash payments even when the payments are made in lieu of providing the advantages described in that section in kind. The county argues that the uniform allowance is not "compensation," relying on *Guelfi* for that position.

The parties in *Guelfi*, *supra*, 145 Cal.App.3d 297, agreed that the Marin County uniform allowance in issue there was "remuneration" and the Court of Appeal impliedly agreed. The court held, however, that the uniform allowance was not "compensation." In so doing it relied on *Rose* v. *City of Hayward*, *supra*, 126 Cal.App.3d at page 943. ▮▮▮ *Rose* construed former section 20022, a provision of the Public Employees' Retirement Law (PERL) (§ 20000 et seq.),[16] which at that time defined "compensation" for purposes of that retirement system as "remuneration paid in cash" and, like the original version of section 31460, added "plus the monetary value . . . of living quarters, board, lodging, fuel, laundry, and other advantages of any nature" with the additional qualification "furnished [to] a member by his employer in payment for his services."[17]

▮▮ The *Rose* court did not attempt a comprehensive construction of "other advantages" as used in former section 20022, but reasoned that provision of a uniform or uniform allowance that substituted for clothing the employee would normally be expected to provide was among the other advantages that were to be included in compensation under the controlling PERL statute. The court rejected an argument that the uniform allowance was not compensation because the uniform was for the convenience of the employer. "To say that the uniform allowance benefits the employer . . . begs the question. The issue is whether or not the allowance provides an 'advantage' to the *employee*. While it is accurate to say that uniformity of attire provides a benefit to the employer in that it makes these civil servants readily identifiable to the public, it is at the same time accurate to say that

---

[16]"[W]hen words used in a statute have acquired a settled meaning through judicial interpretation, the words should be given the same meaning when used in another statute dealing with an analogous subject matter; this is particularly true, where . . . both statutes were enacted for the welfare of employees and are in harmony with each other." (*Kuntz* v. *Kern County Employees' Retirement Assn.* (1976) 64 Cal.App.3d 414, 422 [134 Cal.Rptr. 501].)

[17]These "other advantages" to state employees are now governed by section 19822, which expressly limits those to be included in "compensation" for pension purposes to advantages provided as remuneration for the employee's work. The PERL definition of "compensation" differs from section 31460 in that it does not exclude these maintenance items.

Section 19822 provides:

"(a) The director shall determine the fair and reasonable value of maintenance, living quarters, housing, lodging board, meals, food, household supplies, fuel, laundry, domestic servants and other services furnished by the state as an employer to its employees.

"The value so determined shall constitute the charge to be made to state employees for any such maintenance or other services furnished by the state, unless the employee is entitled thereto as compensation for his or her services or as actual and necessary expenses incurred in the performance of the state's business. Whenever a state employee is entitled to such maintenance or other services as part or full compensation for services rendered, the value thereof for retirement purposes, as defined by Section 20022 [defining compensation], and for salary or wage fixing purposes, shall also be determined in accordance with the values established by the department hereunder. . . ."

the uniform allowance provides a benefit to the employee in that the uniform substitutes for personal attire which the employee would otherwise be forced to acquire with personal resources. Therefore, the uniform allowance must be included in the computation of pension benefits." (*Rose* v. *City of Hayward, supra,* 126 Cal.App.3d at p. 943, fn. omitted.) In distinguishing some work-related attire such as specially designed asbestos uniforms, which would not constitute "compensation," the court equated provision of work-related attire and cash in lieu of such attire for pension computation purposes. (*Id.* at p. 943, fn. 2.)

CERL differs from the PERL legislation under consideration in that it excludes, rather than includes, the monetary value of an advantage provided in kind. It does not follow, however, that when the advantage is one received by the employee in cash, the section 31460 exclusion for the "monetary value" of the advantage is applicable. Under the distinction the statute makes for in-kind advantages, even though a noncash "advantage" may be "remuneration" for the employee's services, the Legislature has relieved CERL counties of the obligation to assign a cash value to in-kind advantages provided to employees and of including that amount in "compensation" for pension purposes. The Legislature has recognized that some employees receive remuneration other than wages or salary but has concluded that if those "advantages" are not paid in cash, their value need not be included in "compensation" for purposes of computing a pension. It has not done so for cash payments made in lieu of providing the same advantages in kind. When paid in cash, the payment is remuneration and, as it is not excluded, it is "compensation" under section 31460.

Here, the Court of Appeal held, without analysis other than a citation to a portion of *Guelfi* which discusses section 31461 rather than section 31460, that annual leave redemption and the county's longevity incentive were "compensation" under section 31460. We agree that both the longevity bonus and cashed-out accrued vacation are remuneration under section 31460 and, since neither is an excluded "advantage," both are "compensation."

Plaintiffs concede that when annual leave is received as time off, it does not meet the statutory definitions of "compensation" or "compensation earnable." When annual leave is taken as time off, the employee simply continues to receive regular salary or wages without the necessity of performing services. Receipt of that pay is part of the employee's "remuneration" for past services and is "compensation." When an employee elects to receive cash in lieu of accrued vacation and the wages or salary the employee would receive during the vacation period, the cash, like the vacation

pay the employee would otherwise receive, is part of the employee's "remuneration" for past services. The same analysis applies to the county's "longevity incentive" since that item simply grants additional vacation hours to be accrued or cashed out to those employees with five years or more service who are covered by the resolution. Payment to longtime employees, whether in salary for vacation days on which no work is performed or in additional cash, is equivalent to increased pay that often accompanies seniority. It, too, is "remuneration" and "compensation."[18]

The other items plaintiffs claim should be recognized as "compensation" also are so closely related to services performed by employees that they must be considered remuneration for services. Bilingual premium pay is available only to employees in positions requiring bilingual skills. The amount of the pay is based in part on the number of hours in which the employee fills the position and in part on the level of the employee's ability to use the second language. Thus, the premium is paid for services in which these skills are used by the employee. For similar reasons, pay for acting as a field training officer and for motorcycle duty appears to be remuneration for services, as are overtime pay, holiday pay, and specified payments in lieu thereof. "Educational incentive pay" is remuneration for services presumably performed at the higher level of competence expected or required of employees holding POST or pilot certification. These methods of paying employees for services that are expected to be performed with special skills or at a higher level of competence cannot be distinguished for this purpose from classification schemes which create separate job categories or levels within employment categories to reflect special skills required or additional duties performed by the employee.

*Guelfi, supra*, on whose reasoning the Court of Appeal also relied in concluding that educational incentive pay is "compensation,"[19] held that Marin County educational incentive pay, similar to that allowed by Ventura County, was not an excluded "advantage" and is "remuneration" that is to be included in "compensation." (145 Cal.App.3d at p. 304.) The *Guelfi* court reasoned that the education and training which qualified the employee for the pay was for the benefit of the employer, and recognized that the amount of pay and the extent of education and training varied with the employee's certification. (*Ibid.*) As the foregoing discussion reflects, we agree. These

---

[18] In 1996, the county replaced the "longevity incentive" for unrepresented employees with increased compensation.

[19] The court did not separately address the status of bilingual premium pay and the field training bonus as "compensation" under section 31460. It assumed that this pay is "remuneration" and "compensation" when it addressed whether they were "compensation earnable" under section 31461.

items are remuneration for special skills or qualifications. The remuneration is paid in cash. It is, therefore, compensation within the meaning of section 31460.

### B. *"Compensation earnable"*

The principal dispute between the parties is over the meaning of "compensation earnable" as that term is used in section 31461. The meaning of the term is crucial to the outcome of this case because, as noted earlier, the "final compensation" upon which an employee's pension is based is his or her "average annual compensation earnable" over the applicable three-year (§ 31462) or one-year (§ 31462.1) period.

Pursuant to section 31461 the county determines a retiring employee's "compensation earnable" for the selected period "upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay. The computation for any absence shall be based on the compensation of the position held by the member at the beginning of the absence."

The county argues that under this formula only that pay which is received by all employees in the grade or class in which the retiring employee worked must be considered and that neither overtime nor any premiums paid for special skills or certification need be included in determining "compensation earnable." It relies on *Guelfi* where the Court of Appeal held that overtime, educational incentive pay, and a uniform allowance were excludable in computing "compensation earnable." The *Guelfi* court first reasoned that section 31461 would have been unnecessary if all items of "compensation" received by a retiring employee not specifically excludable under section 31460 were to be included in "compensation earnable." Therefore, section 31461 contemplated something more than a calculation of the retiring employee's average pay during the selected year. It was necessarily a narrowing definition. (*Guelfi, supra,* 145 Cal.App.3d at pp. 304-305.)

The *Guelfi, supra,* court then considered educational incentive pay, and held that, because section 31461 defines "compensation earnable" as a figure "based on the average number of days ordinarily worked by persons in 'the *same grade or class of positions . . .* , and at the *same rate of pay,*'" educational incentive pay was not includable. (145 Cal.App.3d at p. 305.) Not all persons in the same grade or class of positions qualified for educational incentive pay and those who did qualify might not hold the same certificates. Employees who were in similarly graded or classified positions were not compensated at the same rate of pay. Therefore, "section 31461

does not contemplate inclusion of such compensation in its definition of 'compensation earnable.'" (*Ibid.*) CERL created a "fixed" rather than a "fluctuating" retirement plan. (*Id.* at p. 306.)

As to overtime pay, "[t]wo obstacles in the definition prevent an interpretation which would include overtime pay. First, the Board must make its determination upon the basis of the number of 'days' ordinarily worked. The choice of the word 'days' rather than 'hours' or some other temporal measure suggests reference to a standard work week (or month) and not to any extra hours put in as overtime. Appellants themselves view that language as clearly indicating an intent that the Board use the *day* as a unit of measure. Second, the Board is to base its determination on the number of days 'ordinarily' worked by others of the same rank. In common usage, 'ordinarily' means 'in the ordinary course of events' or 'usually.' (Webster's Third New Internat. Dict. (1965) p. 1589.) *Omission* of the word 'ordinarily' might suggest calculation based upon the *actual* number of days worked by others (assuming for the sake of argument that whole days of overtime are worked), and even then, the basis would be the number of days worked by *others*, not the number of days personally worked by the retired or retiring member. However, the word is specifically inserted and must be read as qualifying the phrase which it precedes so as to give it meaning. We therefore conclude . . . that overtime pay is not 'compensation earnable' and thus is not to be included in computing appellant's 'final compensation.'" (*Guelfi, supra*, 145 Cal.App.3d at pp. 306-307, original italics.) The same reasoning led the court to conclude that uniform allowances and educational incentive pay were excluded from "compensation earnable." (*Id.* at p. 307.)[20]

*Guelfi* thus held that an item of compensation must be received by all employees in the applicable grade or class of position if it is to be part of a retiring employee's "compensation earnable." The Court of Appeal here relied on *Guelfi*, holding that because "compensation earnable" means the "*average ordinary pay of workers in a class; not the actual pay of any individual,*" none of the items sought to be included by plaintiffs (except contribution of matching funds to a deferred compensation plan) qualified. Were these incentives and premiums included in the computation, the average pay for all workers in the class would be unjustifiably increased. While plaintiffs accept the *Guelfi* construction of section 31461 insofar as it applies to overtime pay, they argue that the exclusion of the premiums in dispute here from "compensation earnable" is not supported by the statutory language or the legislative history of section 31461. They contend that the

---

[20]The exclusion of overtime pay from "compensation earnable" is not challenged by plaintiffs.

Court of Appeal in this case erred in directing that the *Guelfi* formulation of "compensation earnable" be applied to those items in the computation of their pensions.

As noted earlier, section 31461 defines "[c]ompensation earnable" as "the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay." The purpose of this definition, plaintiffs argue, is simply to ensure that overtime is omitted from the calculation and to ensure that if an absence resulted in an employee working fewer days than those ordinarily worked by comparable employees, the employee would nonetheless be deemed to have been compensated for the difference at the same rate attached to the position at the time the absence commenced. Nothing in the wording of section 31461 requires that the amount of pay included in "compensation earnable" be only that received by all employees in the same job category. The reference to persons "at the same rate of pay" simply identifies the category of employees who must be considered in determining the average number of days ordinarily worked and provides the reference for determining the compensation to be considered for a period of absence. If, as the Court of Appeal and the *Guelfi* court held, only those items of "compensation" received uniformly by all persons in the pay grade are to be included, there would be no need to find the "average" compensation of persons in that pay grade. The Court of Appeal formulation, they argue, renders the term "average" surplusage. The only construction which gives meaning to the command that "compensation earnable" be based on the "average compensation" of persons in the pay grade is one which anticipates that the individual compensation of persons in the pay grade is not uniform so that there is something to "average."

In plaintiffs' view, section 31461 in directing that "average compensation for the period under consideration" be calculated "upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period and at the same rate of pay" does no more than ensure that a retiring employee's average compensation be determined in relation to what the employee would have earned if he worked the average number of days ordinarily worked by employees in the same grade or class and at the same rate of pay. This is consistent with the penultimate sentence of section 31461 which provides that "compensation earnable" for any period of absence is to be based on "the compensation of the position held" at the beginning of the absence.

Plaintiffs also argue that the history of section 31461 supports their construction. They rely on the wording of the predecessor to section 31461

in the 1937 version of CERL and legislative history which indicates that while the present wording of section 31461 differs from that found in CERL when enacted in 1937, the rewording of the provision was not intended to make any substantive change. First they note that section 31461, adopted in 1947 (Stats. 1947, ch. 424, § 1, p. 1264),[21] is simply a codification of the 1937 law. (Stats. 1937, ch. 677, § 1, p. 1898.) The 1947 statute was enacted as part of Senate Bill No. 1117 (1947 Reg. Sess.) which codified and consolidated laws related to counties. A Legislative Counsel's report on Senate Bill No. 1117 advised that the bill "makes no substantive changes in existing law, but rearranges and restates in simplified language the substance of existing laws, and repeals obsolete and superseded statutes."[22]

Section 8.5 of article 1 of CERL in 1937, the predecessor to section 31461, provided: " 'Compensation earnable' *by a member* shall mean the compensation as determined by the retirement board which would have been earned *by the member* had he worked throughout the period under consideration, the average number of days ordinarily worked by persons in the same grade or class of positions as the positions held by him during such period, and at the rates of compensation attached to such positions, it being assumed

---

[21]As enacted, section 31461 read: " 'Compensation earnable' by a member means the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay. The computation for any absence shall be based on the compensation of the position held by him at the beginning of the absence." (Stats. 1947, ch. 424, § 1, p. 1264.)

[22]Plaintiffs' request that we take judicial notice of this document is granted. A reviewing court is required to take judicial notice of matters properly noticed by the trial court and those the trial court was required to notice under section 451 or 453 of the Evidence Code. (Evid. Code, § 459.) Plaintiffs requested that the Court of Appeal take judicial notice of various items of legislative history, including this document, but it is not clear from the record whether that court did so. The Court of Appeal opinion recites that consideration of the materials is unnecessary as the statutes under review are unambiguous, but the opinion does not indicate whether the request for judicial notice was granted.

Arguably the Court of Appeal was required to take judicial notice of all of the items encompassed by plaintiffs' request other than a publication of the county supervisors association as all of the other items are copies of documents which reflect "official acts of the legislative [and] executive . . . departments" of this state. (Evid. Code, § 452.) Plaintiffs' request complied with Evidence Code section 453. This court is therefore required to take judicial notice of the items. It does not follow, however, that all are relevant and must be considered by the court. A memorandum from a staff member of the Attorney General to the Governor does not appear to be relevant in ascertaining the legislative intent underlying section 31461 inasmuch as there is no indication that the views of the author regarding the purpose and content of Senate Bill No. 1117 were before the Legislature at the time the bill was enacted and therefore may be deemed to reflect legislative intent.

that during any absence he was in the position held by him at the beginning of such absence." (Stats. 1937, ch. 677, § 8.5, pp. 1898-1899, italics added.)[23]

Assuming that, as plaintiffs contend, section 31461 is nothing more than a restatement of section 8.5 of the 1937 version of CERL, section 8.5 supports plaintiffs' proposed construction of section 31461, as do other statutes which predate CERL and used the term "compensation earnable" in creating state employee pensions.[24] The term is found in the act which established a retirement system for state employees in 1931. (Stats. 1931, ch. 700, § 1, p. 1442.) Section 13 of that act provided: " 'Compensation earnable' by a member shall mean the average compensation as determined by the board upon the basis of the average period of employment of members in the same class of employment and at the same rate of pay, but such 'compensation earnable' shall not exceed four hundred sixteen dollars and sixty-six cents per month."[25] The term was used again in 1935 when the 1931 act was amended to provide for retirement of California Highway Patrol Officers. (Stats. 1935, ch. 850, § 3, p. 2277.) Section 13 of the 1931 act was then amended to read: " 'Compensation earnable' by a member shall mean the · average monthly compensation as determined by the board upon the basis of the average time put in by members in the same group or class of employment and at the same rate of pay, it being assumed that during any absence said member was in the position held by him at the beginning of the absence and that prior to entering State service he was in the position first held by him in such service, but such 'compensation earnable' shall not exceed four hundred sixteen dollars and sixty-six cents per month." (*Ibid.*)

The definition was repeated in substantially the same terms in the 1945 legislation which codified the state retirement system, now the Public Employees' Retirement System (PERS). (§ 20000 et seq., added by Stats. 1945,

---

[23]Section 8 of CERL then defined "compensation" as "the remuneration paid in cash out of county or district funds controlled by the board of supervisors, plus the monetary value, as determined by the board of retirement, of board, lodging, fuel, laundry and other advantages of any nature furnished to a member in payment for his services." (Stats. 1937, ch. 677, § 8, p. 1898.)

Section 9 defined "final compensation" as "the average annual compensation earnable by a member during the three years immediately preceding his retirement." (Stats. 1937, ch. 677, § 9, p. 1899.)

[24]The term "compensation earnable" is used in some 80 pension-related code sections, primarily in the Government Code and Education Code. The definition sections in the Education Code differ significantly from those for state and county employee pensions. (See, e.g., Ed. Code, §§ 22115, 22119.2.)

[25]Section 12 of the act defined "compensation" as "the remuneration paid in cash out of funds controlled by the state plus the monetary value, as determined by the board of administration, of board, lodging, fuel, laundry and other advantages of any nature furnished by the state to a member in payment for his services." (Stats. 1931, ch. 700, § 12, p. 1443.)

ch. 123, § 1, p. 573 et seq.) As enacted in 1945, section 20023 defined " 'Compensation earnable' by a member" as "the average monthly compensation as determined by the board upon the basis of the average time put in by members in the same group or class of employment and at the same rate of pay. The computation for any absence of a member shall be based on the compensation of the position held by him at the beginning of the absence and that for time prior to entering State service shall be based on the compensation of the position first held by him in such service." (Stats. 1945, ch. 123, § 1, p. 575.)[26]

The Legislature is presumed to be aware of other statutes on the same or analogous subject matter in which the same language is used. Since we have no reason to think that the Legislature intended that the same specifically defined term take on a different meaning in computing the pension of a county employee, the construction of "compensation earnable" should be consistent under CERL, the 1931 State Employee Retirement Act, and PERL, which is the successor to the 1931 act.

Each of these definitions suggests that "compensation earnable" is the average pay of the individual retiring employee computed on the basis of the number of hours worked by other employees in the same class and pay rate—that is the average monthly pay, excluding overtime, received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level.

The above version of section 20023—the PERL definition of "compensation earnable"—was repealed in 1993 and replaced with a new section 20023 that expressly included "special compensation" in "compensation earnable," and made it clear that the individual employee's pay is the basis for computing the employee's "compensation earnable." (§ 20023 as enacted by Stats. 1993, ch. 1297, § 6.) Moreover, the items plaintiffs seek to have included in their "compensation earnable" appear to be the type of "special compensation" items which are included in the "compensation earnable" of PERS members. (§ 20636.)[27] The Legislative Counsel's Digest of Senate Bill No. 53 (1993-1994 Reg. Sess.), which contained former section 20023,

---

[26]The second sentence of section 20023 was amended a second time by the 1949 Legislature and read: "The computation for any absence of a member shall be based on the compensation earnable by him at the beginning of the absence and that for time prior to entering state service shall be based on the compensation earnable by him in the position first held by him in such service." (Stats. 1949, ch. 1218, § 1, pp. 2143-2144.)

[27]Section 20636 now provides: "(a) 'Compensation earnable' by a member means the payrate and special compensation of the member, as defined by subdivisions (b), (c), and (g),

notes that bill recasts and redefines "compensation" and "compensation earnable," but does not indicate that the inclusion of "special compensation" in the definition adds anything that was not included under the prior legislation or results in higher "final compensation" or increased pensions.

We agree with plaintiffs therefore that both the language and the history of section 31461 support a conclusion that the premiums in dispute are "compensation earnable" within the meaning of that section and must be included when their pensions are calculated. To the extent that *Guelfi* is inconsistent with this conclusion, it is disapproved.

The county does not address plaintiff's legislative history argument and does not acknowledge the definition of the term "compensation earnable" in PERL or its predecessor. It claims only that *Guelfi* properly construed sections 31460 and 31461; that the Legislature has acquiesced in this construction; and that the doctrine of stare decisis teaches that this long-standing construction should be respected by this court.

The county's legislative acquiescence argument is based on what it claims are almost 100 amendments to various provisions of CERL between 1984 and 1995, 11 of which occurred in the year immediately following *Guelfi*. None of those amendments made any change in the language construed by the Court of Appeal in *Guelfi*, however.

The county also relies on the principle of statutory construction teaching that "[t]he failure of the Legislature to change the law in a particular respect

---

and as limited by Section 21752.5.

"(b)(1) 'Payrate' means the normal monthly rate of pay or base pay of the member paid in cash to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"(c)(1) Special compensation of a member includes any payment received for special skills, knowledge, abilities, work assignment, workdays or hours, or other work conditions.

"(2) Special compensation shall be limited to that which is received by a member pursuant to a labor policy or agreement or as otherwise required by state or federal law, to similarly situated members of a group or class of employment that is in addition to payrate. If an individual is not part of a group or class, special compensation shall be limited to that which the board determines is received by similarly situated members in the closest related group or class that is in addition to payrate, subject to the limitations of paragraph 2, of subdivision (e)."

Section 20636, subdivision (g) is applicable only to state members of PERS and includes special compensation. It defines "compensation earnable" as "the average monthly compensation . . . upon the basis of the average time put in by members of the same group or class of employment and at the same rate of pay, and is composed of the payrate and special compensation of the member. . . ." (*Ibid.*) Section 21752.5 limits the amount of compensation considered in computing benefits for employees who become members of PERS on or after July 1, 1996, to that permitted by the Internal Revenue Code for public retirement systems.

when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended." (*Cole* v. *Rush* (1955) 45 Cal.2d 345, 355 [289 P.2d 450, 54 A.L.R.2d 1137]; see also *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394]; *Estate of McDill* (1975) 14 Cal.3d 831, 837-838 [122 Cal.Rptr. 754, 537 P.2d 874].) This principle assumes legislative knowledge of judicial construction of the law. (See *Fontana Unified School Dist.* v. *Burman* (1988) 45 Cal.3d 208, 219 [246 Cal.Rptr. 733, 753 P.2d 689]; *Cole* v. *Rush*, *supra*, at pp. 355-356.)

It is not clear, however, that the general subject of county employee pensions was before the Legislature when any of the amendments to which the county refers was enacted. Instead, the amendments appear to address discrete aspects of the law or to have a general but nonsubstantive effect, such as gender-neutral wording. The county identifies none which suggests that the subject of pension computation generally was before the Legislature when one or more of the amendments was enacted. " ' " '[S]omething more than mere silence is required before [legislative] acquiescence is elevated into a species of implied legislation.' " ' " (*Ornelas* v. *Randolph* (1993) 4 Cal.4th 1095, 1108 [17 Cal.Rptr.2d 594, 847 P.2d 560].) That being so, we cannot infer that the Legislature had section 31461 and *Guelfi* in mind when those amendments were adopted and intended by inaction to acquiesce in the *Guelfi* construction of that statute.

Two of the amendments did affect section 31461. The 1995 amendment (Stats. 1995, ch. 558, § 1) added the last sentence ensuring that deferred compensation would be included in "compensation earnable" in the year earned. That sentence had been part of a subdivision added to section 31461 in 1993 (Stats. 1993, ch. 396, § 3) which was applicable only to Los Angeles County and was repealed in the 1995 amendment. Again, however, we cannot assume that, in enacting a measure regarding the time at which deferred compensation is earned for pension purposes, the Legislature had the general subject of pension computation or specifically the *Guelfi* definition of "compensation earnable" in mind.

The stare decisis argument is also unpersuasive. ■ Stare decisis is, as we have recognized, "a fundamental jurisprudential policy that prior applicable precedent [of an appellate court] usually must be followed [by that court] even though the case, if considered anew, might be decided differently by the current justices." (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296 [250 Cal.Rptr. 116, 758 P.2d 58].) ■ *Guelfi* is not prior precedent of this court, however. The issue is one of first impression in this court.

Finally, the county asserts that the 20 CERL counties whose actuarial calculations, and thus whose contributions to the retirement system, are based on the *Guelfi* construction of section 31461 would face practical problems if we depart from *Guelfi*. It claims that absent the certainty afforded by the *Guelfi* formulation, counties cannot perform their statutory obligations to adequately fund their retirement systems. *Guelfi*, they argue, has clarified any ambiguities in the statutory language in holding that compensation which is not paid uniformly to all persons in the same grade or class is not "compensation earnable." No other county is before us in this matter, however, and we need not decide whether this decision applies retroactively to any other county.

There may be unanticipated costs to Ventura County if the pensions of the individual plaintiffs and the employees the association represents must be recalculated and adjusted upward. If so, to comply with the financial provisions of CERL (§ 31580 et seq.) and accommodate future increases, the county may have to make a supplemental appropriation and adjust the future annual appropriation for its contribution to the pension fund to cover the increase in future retiree pensions that results from inclusion of additional items of "compensation" in "compensation earnable." Past experience should enable the county to anticipate the number of employees who will receive premium pay, however, and adjustments of this nature are contemplated by CERL. (See §§ 31453, 31454.) Nothing in this record suggests that the burden on the county fisc justifies either perpetuation of an erroneous construction of the applicable statutes or denying these plaintiffs the benefit of our decision.

## IV

### *Disposition*

The judgment of the Court of Appeal is reversed with directions to order the superior court to grant the petition for mandamus and remand the matter for further proceedings consistent with this opinion.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

The petition of all respondents for a rehearing was denied October 1, 1997.