[Civ. No. 35276. First Dist., Div. Four. Feb. 26, 1975.]

DEAN MADSEN, Plaintiff and Appellant, v.
OAKLAND UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents;
CITY OF OAKLAND, Real Party in Interest and Respondent.

**COUNSEL**

Russell Bruno for Plaintiff and Appellant.

Richard J. Moore, County Counsel, and Larry Lee Litke, Deputy County Counsel, for Defendants and Respondents and for Real Party in Interest and Respondent.

**OPINION**

**RATTIGAN, Acting P. J.**—This litigation involves the legality of a grant of public funds made to respondent Oakland Unified School District by respondent City of Oakland. Commencing it as a purported citizen-taxpayer class action for declaratory relief against all the respondents, appellant Dean Madsen sought a judgment invalidating the grant and ordering reimbursement of the funds. After a nonjury trial at which the parties stipulated to all the pertinent facts, the trial court entered a

judgment which expressly disallowed appellant's various contentions and denied relief. He appeals from the judgment.

*Facts*

During the 1972-1973 school year, respondent school district experienced an unexpected decline in average daily attendance which produced a proportionate reduction in the district's state aid and a consequently anticipated deficit of $700,000 in the district's general fund. On February 13, 1973,[1] John H. Reading (the mayor of respondent city) publicly proposed that the Oakland City Council appropriate $700,000 to provide financial assistance to the school district. Formal request for the appropriation was made by the school district at a public meeting of the city council on March 6. The city council initiated action to appropriate the funds on March 29 and, on April 19, adopted resolution No. 53083 which authorized transfer of $700,000 from the general fund of the city to the general fund of the school district. The proposal was a matter of public knowledge, having received widespread newspaper publicity from its inception. The school district actually received the funds on May 1, and had spent them by June 30.

The City of Oakland is a charter city. (See Cal.Const., art. XI, §§ 3, 5.) Respondent district is a city school district governed by a board of education. (See *id.*, art. IX, § 16.) The city and the school district are not entirely coterminous; small areas of the city lie outside the district.

*Procedural Sequence*

Appellant filed his complaint against respondents on June 8, naming as plaintiffs himself "individually and as the representative of all other resident citizen taxpayers of the City of Oakland," seeking declaratory relief and the recovery of the $700,000 by the city from the school district, as described above. In addition to naming the school district and its personnel as defendants, he named and joined the city, as "real party in interest," upon the stated ground that it had refused to permit its joinder in the action as a party plaintiff.

The city filed an answer as "real party in interest" on a date not designated in the record. The other respondents (including the school

---

[1]Unless otherwise indicated, all references to dates hereinafter are to the calendar year 1973.

district) answered the complaint on July 10, pleading material admissions and denials and various affirmative defenses.[2]

When the cause came on for trial, the parties stipulated that there were no factual issues to be tried and submitted the matter. Judgment in favor of the named defendants and of the City of Oakland (i.e., for all respondents) was duly entered on March 22, 1974.[3] Appellant's motion for a new trial was denied; this appeal followed.

The principal question on the appeal is whether respondent city could legally make the disputed $700,000 grant to the school district. We hold that it could and did; we affirm the judgment.

### Discussion

■ Appellant contends that charter cities are without power to expend municipal funds for other than strictly municipal purposes unless such power is expressly conferred on the city by charter provision or by the Legislature. He asserts that, because education is a matter of general concern as distinguished from a "municipal affair," respondent city had no authority to expend city money for education in the absence of a provision in its charter permitting such expenditure.

The Oakland Charter, as adopted by the electorate of the city in 1968, contains no express provision for school financing. Section 304 provides for the election of the board of education and concludes with the statement that "[t]he provisions of the Education Code of the State of California shall apply as to matters not provided for in this Charter." Appellant asserts that section 304 is an unambiguous declaration of an intent by the voters to divest themselves of all power with respect to school financing.

■ While education is generally held to be a matter of state concern (*Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 152 [82 P.2d 434, 126 A.L.R. 838]; *Lansing* v. *Board of Education* (1935) 7 Cal.App.2d 211, 213 [45

[2]The affirmative defenses were (1) that appellant's complaint failed to state a cause of action; (2) laches, in that the proposed grant to the school district was known to the public and to appellant for four months before it was made on April 19, that he took no action to prevent it, that he made no demand that the city council recover it until June 1, and that the school district was "damaged and prejudiced" by these circumstances because it had meanwhile spent the money; and (3) that, under the same circumstances, appellant "is or should be estopped from bringing this action."

[3]The record includes no formal findings of fact or conclusions of law; apparently, none were requested.

P.2d 1021]; see, generally, *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]), it may properly be made a municipal affair when the city acts in promotion and not in derogation of the purposes of the state. (*Berkeley Sch. Dist.* v. *City of Berkeley* (1956) 141 Cal.App.2d 841 [297 P.2d 710].) In the decision last cited, the court stated: "The Constitution does not expressly give the power of taxation to city boards of education but it does allow a chartered city complete authority in municipal affairs (Cal. Const., art. XI, § 8). Although education in general is a state affair, it may be made a municipal affair in part when the city acts in promotion and not in derogation of the purposes of the state. This proposition was firmly established in *Whitmore* v. *Brown,* 207 Cal. 473, 480 [279 P. 447]. The court in that case distinguished (at p. 481) between taxes of the school districts and city taxes for the benefit of the schools. As to the former, the state law governs; but as to the latter, a chartered city is free to act in furtherance of the policy of the state in favor of diffusion of knowledge and intelligence (Cal. Const., art. IX, § 1).

". . . . . . . . . . . . . . . . . . . . .

"Education, generally, is a state affair; but if a chartered city chooses to render financial assistance to education, that is a municipal affair; and, therefore, the choice of a plan of assistance, not in conflict with state statute, including the delegation of powers of government, as adopted by the voters in approving the charter provision, is within the powers of a chartered city." (*Berkeley Sch. Dist.* v. *City of Berkeley, supra,* 141 Cal.App.2d 841 at pp. 846-847.)

■ A charter city retains complete control of municipal affairs, whether or not its charter expressly enumerates a power over the specific municipal affair in question. (*Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 347 [71 Cal.Rptr. 135, 444 P.2d 711]; *City of Pasadena* v. *Charleville* (1932) 215 Cal. 384, 391-392 [10 P.2d 745] [overruled on other grounds in *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 585 (79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194)].)

"[I]t is not necessary that the [city] charter specifically legislate on the subject. In order to remove the city's municipal affairs from the control of general laws it is sufficient if the city has availed itself of the offer extended to it by the Constitution as amended in 1914, and has incorporated in its charter an acceptance of the privilege tendered. [Citations.] Where in the one case the charter specifically legislates upon the subject it is deemed a grant of power; and where, on the other hand,

the charter in general terms accepts the offer extended by the Constitution, the enumeration of powers is unnecessary and the general language of the acceptance becomes a limitation of the power of the city and is all-embracing so far as the removal of the municipal affairs of the city from the control of the legislature is concerned. [Citations.]" (*City of Pasadena* v. *Charleville, supra,* 215 Cal. 384 at pp. 391-392.)

 Sections 106 and 207 of the Oakland Charter provided that the city may exercise its corporate powers "subject only to the restrictions and limitations provided in this Charter." The charter contains neither a specific grant of power nor a prohibition with respect to appropriations to aid the school district. Thus, the city clearly had the power to make the appropriation unless, as appellant contends, section 304 of the charter (quoted *supra*) expresses the electors' intent that the Education Code shall exclusively govern all school fiscal matters. Appellant's position is unsupported by the language of the section, its position in the format of the charter in relation to other provisions thereof, and by the history of the charter revision adopted in 1968.

Article I of the charter enumerates the general powers and form of Oakland's government. Article VII deals with fiscal administration. Section 304 is contained in article III, which relates only to city officers and provides for their appointment, removal, powers, and duties. Section 304 itself is concerned exclusively with the board of education. Viewed in its context, the last paragraph of section 304 (providing for the application of the Education Code) can only mean that the code shall govern as to those matters properly within the scope of article III and not specifically detailed in section 304 (e.g., the powers and duties of the board of education, its members' salaries, and so on). It would be incongruous to interpret the provision as a broad limitation of the appropriation powers of the city council under article I of the charter.

The history of the charter revision similarly belies appellant's construction of section 304. It was stipulated that in August 1968, the Oakland City Attorney advised the city, the Oakland Board of Education, and the "Assistant County Counsel" that it was unnecessary to put a school tax provision in the proposed new charter because it might constitute a restriction upon the city's powers to aid the schools, and the city's power in this respect would otherwise be unrestricted. This opinion was reiterated at a public meeting of the Oakland City Council on August 22, 1968. There being no evidence to the contrary, we may reasonably conclude that the city's electors intended and acted to retain the broad powers of a charter city when they adopted the revised charter in 1968.

■ Appellant next contends that an enactment by the 1971 Legislature (Stats. 1971, ch. 956, p. 1861, § 1 et seq. [amending Ed. Code, §§ 939 and 20607 and adding §§ 17311, 17325 et seq., 21107.5])[4] indicates a legislative intent to preempt the field of emergency apportionments to school districts suffering a deficit. ■ It is true that municipal legislation is invalid if it conflicts with general state law (Cal. Const., art. XI, § 7; *In re Lane* (1962) 58 Cal.2d 99, 102 [22 Cal.Rptr. 857, 372 P.2d 897]); if the Legislature adopted a general scheme for the regulation of a particular subject, those aspects of the subject which are covered by the pertinent enactment(s) are removed from local legislative control. (*In re Lane, supra; Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 371 [125 P.2d 482, 147 A.L.R. 515].) In determining whether the Legislature intended to occupy a particular field to the exclusion of all local regulation, however, one must look to the "whole purpose and scope of the legislative scheme" as well as to the language of the particular enactment. (*Tolman* v. *Underhill* (1952) 39 Cal.2d 708, 712 [249 P.2d 280]; *Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 682-684 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].)

■ Appellant argues that chapter 956 demonstrates a serious state concern with the financial and budgetary conditions of school districts, and that the procedures contained therein were therefore intended to provide the exclusive remedy for alleviating the financial problems of a district with a deficit. While the procedures outlined in section 17325 et seq. are mandatory when a school district seeks an emergency apportionment under section 17311, there is no indication, anywhere, that the Legislature intended to make section 17311 the only recourse available to a school district suffering financial problems. The language of section 17311 is permissive: it provides that a school district "*may* request an emergency apportionment" (italics added) to alleviate its deficit.

Moreover, it may not reasonably be presumed that the Legislature intended that a school district with a temporary financial problem, for whatever reason, could not accept funds from a source other than the state. Other statutes indicate to the contrary: section 1044 provides that a school district may accept gifts "made to the district or to or for the benefit of any school or college administered by the district," and section 33401 of the Health and Safety Code provides for the optional payment of funds by a redevelopment agency to school districts within its project areas.

[4]Unless otherwise indicated, all statutory references hereinafter are to the Education Code.

Respondent school district examined and rejected the option of applying for an emergency apportionment pursuant to section 17311. The district considered the fact that there was no guarantee that the apportionment would be made, and that section 17328 required that any amounts received would have to be repaid; this was viewed as a possible continuation of the deficit problem. However, the school district's actual needs are immaterial to the issues of the case.

Appellant further contends that the city's appropriation of the $700,000 was not in promotion of state purposes, but in derogation thereof, and urges that those decisions which hold that a charter city may provide additional monetary support for its schools should be reexamined in light of *Serrano* v. *Priest, supra,* 5 Cal.3d 584.

*Serrano* involved a constitutional attack on the California school financing system, under which the assessed valuation of the property within a district's boundaries was a major determinant of how much the district could spend on its schools. Although the *Serrano* decision is not pertinent to the issues before this court, its language negates appellant's argument and actually supports the conclusion that a municipal gift to a school district is both permissible and proper. Speaking of the state system as it existed at that time, the *Serrano* court stated: "The poor [school] district cannot freely choose to tax itself into an excellence which its tax rolls cannot provide. Far from being necessary to promote local fiscal choice, the present financing system actually deprives the less wealthy districts of that option." (*Id.,* at p. 611.)

Appellant maintains that the $700,000 appropriation was a "void act" in that the appropriation was not included in respondent city's 1972-1973 budget. This contention is without merit. The appropriation was not anticipated at the time the 1972-1973 budget was prepared, and the funds were appropriated from the city's general fund in conformity with sections 207, 210, and 706 of the city charter. Appellant offers no authority prohibiting such an expenditure from the general fund, or to the effect that the procedure followed was inappropriate.

In addition to the area encompassed by the boundaries of respondent district, the Oakland city limits include small areas that lie within the Alameda, Castro Valley, Hayward, San Leandro, and San Lorenzo Unified School Districts. Appellant contends that the city is without power to support the school district with revenues derived from taxation of property located in these other districts. He provides neither argument nor authority for this assertion; therefore, this court may properly treat

the point as waived. (*Greenstone* v. *Claretian Theo. Seminary* (1959) 173 Cal.App.2d 21, 35 [343 P.2d 161]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 425, p. 4391.) It is noted, however, that nothing in the statutes whose operation may produce the overlapping situation described (whether by the annexation of territory by a city without its being annexed by the city's school district, or by the transfer of territory from one school district to another) indicates that a charter city may not grant financial aid to its school district. (See §§ 1974, 2305, 2361 et seq.)

Appellant's final contention is that respondent city did not budget the use of the funds in accordance with section 20953,[5] in that the source of the grant was local property taxes. The effect of section 20953, and the testimony of the director of budgeting of the school district in relation thereto, were limited by stipulation of the parties to the affirmative defenses of laches and estoppel (see fn. 2, *ante*), which were decided in appellant's favor by the trial court and were not made issues on the appeal. In fact, it was appellant who moved to limit the testimony of the director of budgeting. Hence, section 20953 cannot properly be invoked on his appeal.

The judgment is affirmed.

Christian, J., and Emerson, J.,* concurred.

A petition for a rehearing was denied March 28, 1975, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied April 24, 1975.

---

[5]Section 20953 provides as follows: "Notwithstanding the provisions of Sections 20951 and 21001 or any provision of this code to the contrary, the governing board of any school district may, by a majority vote of its membership, and with the approval of the county superintendent of schools, budget and use any unbudgeted income provided during the fiscal year from any source other than local property taxes or the State School Fund, provided that increases in apportionments from the State School Fund to be received during the fiscal year on account of the average daily attendance of pupils in a special program financed by categorical aid from the federal or other governmental source may be budgeted and used under the provisions of this section."

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.