[No. A079920. First Dist., Div. Three. Nov. 30, 1998.]

ROBERT KREEFT et al., Plaintiffs and Appellants, v.
CITY OF OAKLAND et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.B.

**COUNSEL**

Davis, Cowell & Bowe, W. David Holsberry and Philip Paul Bowe for Plaintiffs and Appellants.

Jayne W. Williams, City Attorney, Joyce M. Hicks, Assistant City Attorney, Wendy P. Rouder and Barbara J. Parker, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**PARRILLI, J.**—Plaintiffs are certified class representatives of firefighters who have retired under the Oakland Police and Fire Retirement System (retirees). Under the Oakland Police and Fire Retirement System (Fire Retirement System), a retiree's pension is a fixed percentage of the *current* compensation "attach[ed] to the . . . rank" the retiree held upon retirement. Thus, as the salaries of active firefighters increase, so do the pensions Oakland (City) pays to its retired firefighters. This is a so-called "fluctuating" pension system.[1]

The federal Fair Labor Standards Act of 1938 (FLSA) currently requires the City to pay firefighters time and one-half for every hour they work in

---

[1] A "fluctuating" pension system may be contrasted with a "fixed" pension system in which benefits are based on the compensation paid *to the retiree* in a defined period before retirement. (*Dunham* v. *City of Berkeley* (1970) 7 Cal.App.3d 508, 511, fn. 1 [86 Cal.Rptr. 569].)

excess of 204 hours per 27-day pay period. The City must pay this "overtime" premium even though the firefighters work more than 204 hours as part of their "normal" schedule. The primary question in this case is whether such federally mandated overtime pay is "attached to the rank" the retirees held at the time they retired, and must therefore be included in calculating their pensions. We agree with the trial court that such premium pay is not "attached to the rank" the retirees held at retirement, but is instead "attached" to the individuals within a rank. Consequently, we affirm the judgment.

I

FACTS

The Fire Retirement System is a creature of the Oakland City Charter (Charter) (Charter, art. XXVI). All sworn City firefighters hired on or before June 30, 1976, are members of the Fire Retirement System. Those hired after that date are members of the separate, state-created Public Employees' Retirement System (PERS).

The Charter specifies that, under the Fire Retirement System, a retiree's pension is a fixed percentage[2] of the "compensation attached to the average rank held" at the time of retirement. (Charter, § 2608.) The Charter defines the terms "compensation" and "compensation attached to the average rank held" as follows:

" 'Compensation' as distinguished from benefits under the Labor Code of the State of California, shall mean the monthly remuneration payable in cash, by the City, without deduction, for the time during which the individual receiving such remuneration is a member of the Police or Fire Department, but excluding remuneration paid for overtime and for special details or assignments as provided in Sections 91 and 97 of the Charter." (Charter, § 2607, fn. omitted.)

" 'Compensation attached to the average rank held' shall mean the compensation attached to the lowest rank held during the three years immediately preceding retirement plus one thirty-sixth (1/36) of the difference between it and the compensation attached to any higher rank held during that period of each month . . . the higher rank was held." (Charter, § 2607.)

A.  *FLSA Premium Pay.*

In 1985, the United States Supreme Court held that the FLSA (29 U.S.C. § 201 et seq.) applies to local governments. (*Garcia* v. *San Antonio Metro.*

---

[2]The percentage is determined by factors including years of service and age at retirement.

*Transit Auth.* (1985) 469 U.S. 528 [105 S.Ct. 1005, 83 L.Ed.2d 1016].) The FLSA requires the City to pay its fire protection employees at the "overtime" rate (one and one-half times their regular rate of pay) if they *actually* work more than 204 hours during a standard 27-day work period.[3] (29 U.S.C. §§ 207(a)(1), 207(k); 29 C.F.R. § 553.230(c) (1998).) Hours paid for vacation, illness, leave or similar reasons do not count toward the 204-hour maximum of hours *actually* worked. (29 U.S.C. § 207(e)(2); 29 C.F.R. § 553.221 (1998).)

The City normally schedules most firefighters[4] to work one 24-hour shift every third day. Thus, a firefighter may be scheduled to work nine 24-hour shifts in a twenty-seven-day work period. If a firefighter works this full schedule, he or she will work 216 hours (9 × 24) in the 27-day work period, and will be entitled to 12 hours of pay at time and one-half. However, as a practical matter, more often than not firefighters do not work nine full shifts in a twenty-seven-day period. This is because most pay periods include a mandatory day off, vacation time, sick leave or some other event that brings the firefighter's number of total hours actually worked below the 204-hour maximum. Retirees' own analysis of the data the City provided shows that from 1992 to 1995 the average number of times a firefighter received FLSA premium pay—i.e., the average number of times a firefighter actually worked more than 204 hours in a 27-day pay period—ranged from a low of 2.21 times per year in 1995 to a high of 2.57 times in 1992. This is only a fraction of the 13.5 27-day pay periods during each year.

Moreover, the City's analysis of the 1992-1995 statistical data shows the amount and frequency of FLSA premium pay varied widely from individual to individual and from rank to rank. For example, among the lowest rank ("firefighter"), the percentage who received *no FLSA premium pay at all* ranged from a low of 7 percent in 1995 to a high of 21 percent in 1993; the average number of times an entry-rank firefighter received premium pay ranged from 2.09 times per year to 2.40 times per year; and the number of *actual* premium hours individual entry rank firefighters worked in a given year ranged from a low of 0 to a high of 48.5 hours. Similarly, the

---

[3] The FLSA generally requires overtime pay when workers work more than 40 hours per week. (29 U.S.C. § 207(a)(1).) Because of their unique work schedules, the FLSA contains an exemption for law enforcement and fire protection employees. (29 U.S.C. § 207(k).) Under the exemption, public agencies employing firefighters may select a "work period" of at least seven but not more than twenty-eight days. If a public agency selects a 27-day work period for its firefighters, as the City has done, the agency must pay time and one-half for all hours the firefighter *actually* works in excess of 204 hours per work period. (29 C.F.R. § 553.230(c) (1998); *City of Sacramento* v. *Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1480 [280 Cal.Rptr. 847].)

[4] For our purposes, "firefighters" refers to all City firefighters, engineers, lieutenants, captains, fire boat operators, and fire boat engineers.

percentage of engineers who received no premium pay ranged from a low of 8 percent in 1992 to a high of 27 percent in 1993; the average number of times an engineer received premium pay ranged from 1.75 times per year to 2.48 times per year; and the number of actual premium hours individual engineers worked each year ranged from a low of 0 to a high of 39.2 hours. With respect to the higher ranks, the percentage of lieutenants who received no FLSA premium pay ranged from a low of 9 percent in 1994 to a high of 25 percent in 1993; the average number of times a lieutenant received premium pay ranged from 1.19 to 1.83 times per year; and the number of premium hours individual lieutenants worked each year ranged from 0 to 30.6 hours. Finally, the percentage of captains who received no premium pay ranged from 13 percent in 1994 to 26 percent in 1992; the average number of times a captain received premium pay ranged from 1.93 to 2.16 times per year; and the number of premium hours individual captains worked each year ranged from 0 to 47.2 hours.[5]

Because of the variability in the data, the City's economic expert, Jerald Udinsky, Ph.D., opined in a declaration that the "average" annual number of times all firefighters received FLSA premium pay from 1992 to 1995 (2.5) was not a meaningful predictor of the experience of *most* firefighters. According to Dr. Udinsky: "The use of an average is meaningful in terms of predicting what the experience of the vast majority [of] individuals will be only if the amounts and frequency are regularly distributed in a small range around the average. The average then is useful as a proxy for the expected/ predictable experience because most individuals' actual experience will not differ dramatically/significantly from the average. The data [concerning firefighters' receipt of FLSA premium pay from 1992-1995] is distributed over a wide range, and in an irregular pattern. For example, if 91% of the individuals received FLSA Premium Pay between 2 and 3 occasions a year, the [average of 2.5 times per year] would accurately predict the frequency of receipt of such pay by employees in the Fire Department. However, the data I reviewed reveals that the 2.5 occasions . . . [is] not even close to the actual experience of the vast majority of Fire Personnel."

B. *Procedure.*

Retirees filed a petition for writ of mandate (Code Civ. Proc., § 1085) seeking to force the City to include FLSA premium pay in calculating their pensions. After a hearing, the trial court issued a writ commanding the City to include 30 hours of FLSA overtime pay per year in determining the "compensation attached to the average rank held." This translated into an

[5]The ranks of inspector, fireboat engineer and fireboat operator experienced similar variability during the 1992-1995 period.

additional 15 hours of "straight" pay per year in calculating the compensation attached to each rank.[6]

After the City lost at the first trial, it filed a motion for new trial. The new trial motion relied on the Udinsky declaration, which highlighted the variability of FLSA premium pay from individual to individual and from rank to rank. The trial court granted the motion for new trial. The court stated a new trial was warranted because it was convinced "from its review of the entire record that it should have reached a different decision on the issue of whether [FLSA premium] pay is 'compensation attached to the rank.' " The court noted its original decision was "predicated on FLSA premium pay being dependent upon a person's rank" while the evidence showed such pay was dependent upon "hours actually worked by individuals."

Following a second hearing, the trial court issued its judgment denying the petition for writ of mandate. In its statement of decision the trial court concluded the City pays FLSA premium pay to firefighters for working their normal work schedule, and thus such pay is not "overtime" pay (which the Charter expressly excludes from the definition of "compensation"). (Charter, § 2607; see *City of Sacramento* v. *Public Employees Retirement System, supra,* 229 Cal.App.3d 1470 (*City of Sacramento*).) However, the court found that although FLSA premium pay *is* compensation, it is *not* "compensation attached to the average rank held" for the purpose of determining a retiree's pension. In short, the court concluded FLSA premium pay is not "attached to the rank," but instead depends upon "an individual's work hours during each work period." Thus, FLSA premium pay is not included in the base compensation the City uses in calculating a retiree's pension.

After the trial court denied their motion for new trial, retirees filed this appeal from the judgment.

## II

## DISCUSSION

Ordinary mandamus (Code Civ. Proc., § 1085) is the appropriate procedural mechanism for resolving the dispute in this case. (*McKeag* v. *Board of Pension Commrs.* (1942) 21 Cal.2d 386, 392 [132 P.2d 198]; *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 850 [179 P.2d 799].) ■ A traditional

---

[6]The 15-hour figure is derived from the court's finding that each active employee received FLSA premium pay an average of 2.5 times per year, that on each occasion they worked 12 hours of "overtime," and thus on each occasion were entitled to 6 hours of extra pay $(2.5 \times 6 = 15)$.

writ of mandate under Code of Civil Procedure section 1085 is a method for compelling a city to perform a legal, usually ministerial duty. (*Pomona Police Officers' Assn.* v. *City of Pomona* (1997) 58 Cal.App.4th 578, 583-584 [68 Cal.Rptr.2d 205].) ▉ When a court reviews an administrative decision pursuant to Code of Civil Procedure section 1085, it merely asks whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices the law requires. *(Los Angeles Lincoln Place Investors, Ltd.* v. *City of Los Angeles* (1997) 54 Cal.App.4th 53, 59 [62 Cal.Rptr.2d 600].) In reviewing a trial court's judgment on a petition for writ of ordinary mandate, we apply the substantial evidence test to the trial court's factual findings. However, we exercise our independent judgment on legal issues, such as the interpretation of statutory retirement provisions. (*Scott* v. *Common Council* (1996) 44 Cal.App.4th 684, 689 [52 Cal.Rptr.2d 161]; *Saathoff* v. *City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352]; *Ghilotti Construction Co.* v. *City of Richmond* (1996) 45 Cal.App.4th 897, 903-904, fn. 1 [53 Cal.Rptr.2d 389]; *City of Sacramento, supra,* 229 Cal.App.3d at p. 1478.)

A.   *The Trial Court Properly Found FLSA Premium Pay Is Not "Attached to the Rank" the Retirees Held at Retirement.*

▉ The trial court agreed with retirees that FLSA premium pay was not "overtime" and thus constituted "compensation" within the meaning of the Charter. However, the trial court went on to hold that because FLSA premium pay is highly variable from individual to individual, it is *not* compensation "attached to the . . . rank held." Because we agree FLSA premium pay is not compensation "attached" to a rank, we affirm the judgment.[7]

---

[7]We are less certain the trial court was correct when it concluded FLSA premium pay was not "overtime" within the meaning of the Charter. In reaching this conclusion, the trial court relied on *City of Sacramento, supra,* 229 Cal.App.3d 1470, 1484-1486. However, the *City of Sacramento* court was construing PERS law, and relied on a specific PERS statute that defined "overtime" as employment "in excess of the hours of work considered *normal* for employees on a full time basis." (Gov. Code, § 20025.2, italics added.) Because a firefighter may be entitled to FLSA premium pay even if he is merely working "the hours of work considered normal for [similar] employees on a full time basis," receipt of FLSA premium pay does not mean he is working "overtime" within the meaning of PERS. As the *City of Sacramento* court put it: "[B]ecause the City's firefighters are normally required to work 192 hours during the 24-day work period [which means they would normally be entitled to 10 hours of FLSA premium pay], the FLSA premium is not 'overtime' under section 20025.2 and is therefore not automatically excluded from 'compensation.' " (*City of Sacramento, supra,* 229 Cal.App.3d at pp. 1486-1487.)

Unlike the PERS legislation, however, the Charter does not have a provision that expressly defines "overtime." Thus, if we were to define the term more colloquially as "time beyond or

The parties agree the Charter creates a so-called "fluctuating" pension plan in which pensions increase or decrease as the compensation paid to active employees increases or decreases. (*Eichelberger* v. *City of Berkeley* (1956) 46 Cal.2d 182, 185 [293 P.2d 1]; *Newhouser* v. *Board of Trustees* (1971) 15 Cal.App.3d 322, 327 [93 Cal.Rptr. 166]; *Dunham* v. *City of Berkeley*, *supra*, 7 Cal.App.3d 508, 511, fn. 1 (*Dunham*).) The primary purpose of a fluctuating pension plan is to guarantee the pensioner a fairly constant standard of living despite inflation, and to maintain equality of position between the retired member and the person (or persons) currently holding the rank the pensioner attained before his retirement. (*Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 132 [287 P.2d 765]; *Dunham*, *supra*, 7 Cal.App.3d at p. 514; *Abbott* v. *City of Los Angeles* (1960) 178 Cal.App.2d 204, 215-216 [3 Cal.Rptr. 127].)

Retirees point out that if we include FLSA premium pay in calculating their pensions it would serve to "maintain equality of position" between active firefighters and retired firefighters, since most active firefighters currently receive some FLSA premium pay. However, the mere fact that including FLSA premium pay would arguably serve one of the purposes of a fluctuating pension system does not answer the primary question before us: did the City intend to treat FLSA premium pay as compensation "attached" to a rank?

█ We construe the Charter in the same manner we construe a statute. "Our sole objective is to ascertain and effectuate legislative intent. [Citation.] We look first to the language of the charter, giving effect to its plain meaning. [Citation.] Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history." (*Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 171-172 [36 Cal.Rptr.2d 521, 885 P.2d 934]; *First Street Plaza Partners* v. *City of Los Angeles* (1998) 65 Cal.App.4th 650, 663 [76 Cal.Rptr.2d 626].) Nevertheless, "[a]ny ambiguity or uncertainty in the meaning of pension legislation must be resolved in favor of the pensioner, but such construction must be consistent with the clear language and purpose of the statute." (*Ventura County Deputy Sheriffs' Assn.* v. *Board of Retirement* (1997) 16 Cal.4th 483, 490 [66 Cal.Rptr.2d 304, 940 P.2d 891] (*Ventura County*); *Grimm* v. *City of San Diego* (1979) 94 Cal.App.3d 33, 38 [156 Cal.Rptr. 240].)

---

in excess of a set limit" (Webster's New Internat. Dict. (3d ed. 1961) p. 1611), we might conclude FLSA premium pay *is* "overtime" since it is paid for hours of work performed "in excess of a set limit." However, we need not resolve that issue in this case.

■ Turning first, as we must, to the language of the Charter, we focus on what the City[8] intended when it stated in the Charter that a retiree's pension will be based on the compensation "attached" to the average rank held at the time of retirement. (Charter, § 2608.) Of the many definitions that appear for "attach" in the Oxford English Dictionary the most apposite to this case is: "To adhere to, as an appertaining quality or circumstance; to be incident to . . . ." (1 Oxford English Dict. (2d ed. 1989) p. 759.)[9] Thus, the precise question we must answer is whether FLSA premium pay "adhere[s] to, as an appertaining quality or circumstance" of a particular rank, or is "incident to" that rank.

As the trial court pointed out, the evidence demonstrates that "FLSA Premium Pay is dependent upon an individual's *actual* work hours during each work period." (Italics added.) Thus, FLSA premium pay does not "adhere" to a rank as an "appertaining quality or circumstance." Instead, although all firefighters of all ranks are *eligible* to receive FLSA premium pay, they do not receive such pay merely because they hold a particular rank. In sum, receipt of FLSA premium pay has nothing to do with "rank," and everything to do with a particular firefighter's schedule.

### 1) *The City of Sacramento Case.*

*City of Sacramento, supra,* 229 Cal.App.3d 1470 is retirees' primary authority for their position that FLSA premium pay should be included in calculating their pensions. However, as we explain below, *City of Sacramento* involved PERS. PERS is a fixed (not fluctuating) plan that calculates a retiree's pension on the basis of the compensation "earnable" in a fixed period before retirement. This, of course, is not equivalent to compensation that is "attached" to the rank the retiree formerly held.

In *City of Sacramento* the court considered whether FLSA premium pay was "compensation" for the purpose of calculating firefighter retirement pay under the Public Employees' Retirement Law (PERL), the statutory system that created PERS. (229 Cal.App.3d at p. 1478.) Under the PERL, determining what items constitute "compensation" is essential to computing an

---

[8] We note the charter provisions at issue appear to be part of the charter the Oakland electorate enacted in November of 1968. (*Madsen* v. *Oakland Unified Sch. Dist.* (1975) 45 Cal.App.3d 574, 578 [119 Cal.Rptr. 531]; see *International Assn. of Fire Fighters* v. *City of Oakland* (1985) 174 Cal.App.3d 687, 689 [220 Cal.Rptr. 256].) Thus, we are, in effect, attempting to discern the legislative intent of the electorate. However, in this opinion, we take the liberty of referring to the "City's" intent.

[9] The Oxford English Dictionary provides the following example from Boswell of this meaning of "attach": "For that the right of Chieftainship *attached* to the blood of primogeniture, and, therefore, was incapable of being transferred." (1 Oxford English Dict., *supra,* p. 759, italics added.)

employee's ultimate pension benefits. PERS calculates the pension to equal a certain fraction of the employee's "final compensation," based on the employee's age and length of service. (Gov. Code, former §§ 21252.01, 21252;[10] 229 Cal.App.3d at p. 1478.) At the time pertinent to *City of Sacramento*, the PERL defined final compensation as the " 'highest average annual *compensation earnable* by a member during the three consecutive years of employment immediately preceding the effective date of his retirement.' " (Gov. Code, former § 20024.01, italics added; 229 Cal.App.3d at p. 1479.) Under the PERL, "compensation earnable" is not based on an individual's efforts, but is defined as " 'the *average monthly compensation* as determined by the board upon the basis of *the average time* put in by members in the same group or class of employment and at the same rate of pay. . . .' " (Gov. Code, former § 20023, italics added; 229 Cal.App.3d at p. 1479; see Gov. Code § 20636, subd. (g)(1).) "Compensation" includes " 'any special compensation for performing normally required duties such as holiday pay, bonuses (for duties performed on regular work shift)' " but excludes overtime. (Gov. Code, former §§ 20022, subd. (a)(8), 20025.2; 229 Cal.App.3d at p. 1479.)

The *City of Sacramento* court first concluded that, under the specific definition for overtime the PERL established, FLSA premium pay was not "overtime" and thus was not excluded from the PERL's definition of "compensation." (229 Cal.App.3d at pp. 1479, 1484-1487; see fn. 7, *ante*.)

The *City of Sacramento* court then turned to Sacramento's second argument: that FLSA pay was "serendipitous, nonrecurring and irregular between individual firefighters" and was therefore akin to certain "lump-sum payments" the PERL excluded from the definition of compensation. (229 Cal.App.3d at p. 1487; see *Santa Monica Police Officers Assn.* v. *Board of Administration* (1977) 69 Cal.App.3d 96 [137 Cal.Rptr. 771] [lump-sum payment for unused sick leave and vacation excluded from "compensation" for retirement purposes].) The *City of Sacramento* court concluded checks for FLSA premium pay were not "lump-sum payments" that distort the

---

[10]The PERL was extensively reorganized effective January 1, 1996. (Stats. 1995, ch. 379.) However, the 1995 statute specifically states that it "is the intent of the Legislature in enacting this act to reorganize the Public Employees' Retirement Law . . . in order to facilitate administration. It is not the intent of the Legislature to make any substantive change in the law. Thus, if, in the opinion of any court or administrative officer, a different result under any provisions of [the Public Employees' Retirement Law] . . . would occur because of the enactment of this act, the provisions as read on December 31, 1995, shall be followed and the result shall be as it would have been on December 31, 1995." (Stats. 1995, ch. 379, § 5.) Because the 1995 reorganization was not intended to change substantive law, and because we are discussing the law as it existed at the time the court decided *City of Sacramento*, we refer to the sections that were in effect at the time that case was decided (1991).

legislative scheme, as they were paid regularly and could not accumulate over time. (229 Cal.App.3d at pp. 1487-1488.)

Retirees attempt to analogize the present case to *City of Sacramento* and argue, in effect, that the analysis in that case should determine the result in this case. What retirees fail to acknowledge is that *City of Sacramento* and the present case involve completely separate and dissimilar statutory schemes. The present case involves a fluctuating pension plan under which the key question is whether FLSA premium pay is "attached" to the rank the retirees formerly held. As we have indicated, the Charter does not define the meaning of "attached" in this context, and we are forced to resort to more general sources to determine the meaning of that term.

By contrast, *City of Sacramento* considered a fixed retirement plan where the key question was whether FLSA premium pay is part of the "compensation earnable" by a member. Moreover, the PERL specifically defined "compensation earnable" as " 'the *average monthly compensation* as determined by the board upon the basis of *the average time* put in by members in the same group or class of employment and *at the same rate of pay. . . .*' " (Gov. Code, former § 20023, italics added; 229 Cal.App.3d at p. 1479; see Gov. Code, § 20636, subd. (g)(1).) If we had a similar definition in this case, we would agree that FLSA premium pay is part of the "average monthly compensation" calculated on the basis of the "average time" firefighters work. However, the language of the Charter does not permit us to do so.

Instead of calculating retirement benefits on the basis of the "compensation *earnable*" by those in the retiree's former rank, the Fire Retirement System calculates retirement benefits on the basis of the compensation "attached" to the rank the retiree held upon retirement. In our view, by using the term "attached" the City intended a more restrictive view of compensation than the one the PERL employs. Had the framers of the City Charter wanted to model the Fire Retirement System on PERS or similar fixed pension systems they could have done so. The term "compensation earnable" has been used in various state retirement statues since the 1930's. (See *Ventura County, supra,* 16 Cal.4th at pp. 502-504.) Because the City chose *not* to use that term in the Charter, it is reasonable to conclude it intended to define the scope of compensation in a manner different from the extant state laws.

As we have stated, in the context of the City's Fire Retirement System, "attached" means the compensation must "adhere to" the rank "as an appertaining quality or circumstance." That is, the employee must be entitled to

the compensation by virtue of the rank, and not his individual efforts over and above what are required to obtain the rank. Viewed in this light, the trial court properly concluded that FLSA premium pay is not "attached" to the "average rank held" at retirement. Consequently, the City need not include FLSA premium pay in calculating retirees' pension benefits.[11]

### 2) Cases Interpreting Other Fluctuating Pension Plans.

In addition to *City of Sacramento*, retirees cite cases that address whether specific forms of payment are compensation "attached" to a rank. Retirees claim that, in those cases, the courts concluded pay items were compensation "attached" to a rank even though the pay item was "variable"—meaning some members of a rank received the item while others did not. As we explain below, none of those cases specifically address the issue we consider here (whether FLSA premium pay is "attached" to a rank), and, in our view, they do not compel a different result in this case.

Retirees rely primarily on *Dunham, supra,* 7 Cal.App.3d 508. In *Dunham,* Berkeley had a fluctuating police retirement plan in which benefits were based on the " 'average salary attached to the respective rank or ranks held during the three years immediately preceding the date of retirement . . . .' " (*Id.* at p. 511.) After the plaintiffs in the case retired, Berkeley established a new "Senior Patrolman" and "Career Incentive [P]rogram" which increased the salaries of police who met certain longevity and training requirements. (*Id.* at p. 512.) The retired plaintiffs contended they were entitled to the benefit of these new programs in calculating their retirement benefits. Berkeley responded that the Senior Patrolman and Career Incentive classifications were *new* ranks, created after the plaintiffs retired, and thus they were not the "rank or ranks" the retirees held before retiring; consequently, they were irrelevant to calculating the plaintiffs' pensions.

---

[11]For the same reasons we have distinguished *City of Sacramento, supra,* 229 Cal.App.3d 1470, retirees' reliance on *Ventura County, supra,* 16 Cal.4th 483, is misplaced. *Ventura County* involved construction of the County Employees' Retirement Law (CERL), which defines "compensation" and "compensation earnable" in essentially the same manner as the PERL. (See 16 Cal.4th at pp. 490-491, 503-504.) In that context, and relying on the specific definitions in the CERL, the Supreme Court concluded it is not necessary for certain payments to be made to *all* members of a rank in order for them to qualify as "compensation" and "compensation earnable." (16 Cal.4th at pp. 490-491, 499, 503-505.) The court concluded that, in the context of the CERL and the PERL, " 'compensation earnable' is the average pay of the individual retiring employee computed on the basis of the number of hours worked by other employees in the same class and pay rate—that is the average monthly pay, excluding overtime, received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level." (16 Cal.4th at p. 504.) Again, there is no basis for applying this definition to the term "attached" as used in the Charter.

The Court of Appeal, First Appellate District, Division Four, found the new classifications did not create "new" ranks, but instead added salary classifications within each rank. The court stated: "[R]egardless of the nomenclature adopted by the city, the new classifications are not separate ranks, but restructuring of ranks." (7 Cal.App.3d at pp. 513, 515.) Since almost all of the then-current police employees participated in the new incentive programs, the court found the programs "may reasonably be termed a system of general pay raises." (*Id.* at pp. 513-515.)

Importantly, the *Dunham* plaintiffs introduced evidence that, while employed, they had undergone the same training for which current police employees were receiving extra compensation, and thus would have been entitled to extra compensation under the programs. The *Dunham* court found that because the plaintiffs "performed the services, including training, required of them . . . they are entitled to their deferred compensation which, under the pension plan, is to be based on the benefits now received by their active counterparts." (7 Cal.App.3d at p. 516.) The *Dunham* court made it clear that the plaintiffs' pension would be based on the salary of an active employee who had the same number of years of service the plaintiff had completed. (*Id.* at p. 516.)

There are two things to note about *Dunham*. First, that case involved the definition of "rank"; it did not focus on what it means for compensation to "attach" to a rank. Instead, the *Dunham* court concluded Berkeley could not avoid its obligation to increase the pensions of its retired police by creating bogus "ranks" to disguise a general pay raise. (See *Dunham, supra,* 7 Cal.App.3d at pp. 513, 515.) By contrast, the present case does not involve a dispute over the meaning of "rank," but instead focuses on what it means for compensation to be "attached" to a rank. Moreover, unlike Berkeley, there is nothing to indicate the City pays FLSA overtime pay to its firefighters in an effort to disguise a general pay increase which would otherwise inure to retirees' benefit.

Secondly, the *Dunham* court concluded the retired police had undergone the same training for which current police employees were receiving extra compensation. Thus, the *Dunham* court could say with assurance that the retired police would have received the increased pay had they been employed under the current pay structure. The same is not true here. There was no evidence the schedules the retirees actually worked when they were employed would have made them eligible for FLSA premium pay.

In this regard, the present case is similar to *Baldwin* v. *City of San Diego* (1961) 195 Cal.App.2d 236 [15 Cal.Rptr. 576] (*Baldwin*). In *Baldwin*, the

court rejected a pensioner's contention that she was entitled to benefit from a new 5 percent pay increase added to her former position after she retired. San Diego paid the extra compensation to employees who worked on all legal holidays without compensating time off or who worked most of their hours between 6:00 p.m. and 8:00 a.m. (*Id.* at pp. 243-244.) However, the pensioner did not introduce evidence that, while employed, she worked all legal holidays or worked most of her hours during the night shifts. Thus, there was no evidence "the pensioner had performed, while she was employed, the extra services now being compensated." (*Dunham, supra,* 7 Cal.App.3d at p. 514; *Baldwin, supra,* 195 Cal.App.2d at p. 245.) Thus, the *Baldwin* court concluded the pensioner failed to show she was entitled to benefit from the 5 percent increase.

Similarly, in this case, there was no evidence the retirees "had performed, while [they were] employed, the extra services now being compensated." That is, there was no evidence the retirees' actual work schedules while they were employed required them to work hours in excess of the FLSA maximums. But even if retirees could introduce such evidence, it would merely prove that FLSA compensation was based on their individual efforts and schedules, and that such compensation does not "adhere" to a rank as an "appertaining quality or circumstance."[12]

As the City points out, the cases which have found that certain pay increases or premium pay "attached" to a rank involved situations where an employee either did or did not get the extra pay based on meeting certain criteria. (*Abbott* v. *City of Los Angeles, supra,* 178 Cal.App.2d at pp. 213-215 [longevity and merit pay]; *City of Long Beach* v. *Allen, supra,* 143 Cal.App.2d at p. 35 [same]; *Estes* v. *City of Richmond* (1967) 249 Cal.App.2d 538, 541, 546 [57 Cal.Rptr. 536] ["hazardous duty pay" awarded to all employees who complete one "tour of duty" each month].) Thus, although there was variability, it was limited to whether an employee did or did not get the particular pay item. In each case the court could determine whether the retired plaintiff met the criteria necessary to receive the additional pay. By contrast, FLSA premium pay is variable not only in whether an employee gets it, but in how much the employee gets. As the evidence showed, the amount of FLSA pay each individual firefighter received varied widely. (See Facts, *ante,* pp. 50-51.) Thus, unlike longevity or merit pay

---

[12]Retirees also rely on *Abbott* v. *City of Los Angeles, supra,* 178 Cal.App.2d 204. In that case, the court concluded longevity and merit pay were "attached" to the rank from which the plaintiffs had retired. (*Id.* at pp. 213-214.) However, in *Abbott,* there was evidence the plaintiffs had performed all the "service" for which merit and longevity pay was allowed. (*Baldwin, supra,* 195 Cal.App.2d at p. 245.) By contrast, in this case, there is no indication retirees performed the service for which FLSA pay is currently awarded. (See also *City of Long Beach* v. *Allen* (1956) 143 Cal.App.2d 24, 35 [300 P.2d 349].)

which can be said to "attach" to a rank (albeit based on the retiree's meeting certain criteria), FLSA premium pay "attaches" to an individual firefighter's schedule, not to his rank.

B. *Exclusion of the Splendido Declaration.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

The judgment is affirmed. Costs to respondents.

Phelan, P. J., and Corrigan, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 24, 1999.

*See footnote, *ante*, page 46.