[No. H035064. Sixth Dist. Apr. 20, 2011.]

GAIL LAWRENCE et al., Plaintiffs and Appellants, v.
HARTNELL COMMUNITY COLLEGE DISTRICT, Defendant and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of part II.C.

**COUNSEL**

Law Offices of Michael S. Sorgen, Michael S. Sorgen, Andrea Adam Brott and Lisa P. Mak for Plaintiffs and Appellants.

Law Offices of William E. Brown, William E. Brown, James H. Hartnett and Charles J. Smith for Defendant and Respondent.

**OPINION**

**MIHARA, J.**—Appellants Gail Lawrence and Sharon Culver sought a writ of administrative mandamus (Code Civ. Proc., § 1085) in the trial court to compel their former employer, respondent Hartnell Community College District (the District), to reinstate them as executive assistants to the District's superintendent/president or alternatively, to conduct hearings on the propriety of their "demotions, involuntary transfers, and terminations." The court denied the petition, and appellants challenge that decision on appeal.

Appellants contend the court erred when it determined that their temporary reassignments were not "demotions" (Ed. Code, § 88001, subd. (d)),[1] and their eventual separations from employment were not terminations "for cause" (§ 88001, subd. (h)). We reject their contentions.

## I. Factual and Procedural Background

Appellants were nonunion permanent classified[2] employees of the District who worked as executive assistants to longtime superintendent/president Dr. Edward Valeau. Dr. Valeau resigned at the end of June 2007, and Dr. Phoebe Helm became interim superintendent/president.

She faced a challenging situation: The college was in imminent danger of losing its accreditation. "It was basically on probation because it had failed almost every standard. And so there were seven recommendations and two concerns that had to be corrected" in a relatively short time. "There were over 800 courses that needed to be reviewed . . . ," a task that would require "an extraordinary effort on the part of the faculty." Other issues required action by the board of trustees: "moving forward with an ethics statement and with a sanctions process . . . ." Implementation of shared governance was another issue. The entire process was complicated by a history of "significant tension or animosity" between the administration and the board and the fact that four of the seven board seats would be up for election that November.

Needing "to align the personnel to be able to accomplish the job" and wanting to begin "with a clean slate," Dr. Helm made various personnel changes. Those changes included reassigning appellants, effective July 25, 2007, to equivalent positions assisting the vice-presidents of academic affairs and student services. The assistants to those vice-presidents who "worked in offices that mattered significantly in terms of the kind of content that the president's office would need in order to fully lead the accreditation process" were moved into the office of the superintendent/president.

The reassignments did not affect appellants' job classifications, titles, wages, or benefits. It was made clear to all involved that the reassignments were not performance related. It was also made clear that the moves were temporary and that all four reassignments would be reassessed in February 2008.

---

[1] Further statutory references are to the Education Code unless otherwise noted.

[2] "Classified" employees are those employed in certain nonacademic positions. (§§ 87001.5, 88003, 88076.)

Appellants never reported to their new assignments. Instead, they obtained doctors' notes stating without qualification that they were unable to return to work. Notwithstanding the unqualified nature of their doctors' notes, however, appellants informed the District that they were at all times available to return to their *former* jobs in the office of the superintendent/president.

The District held appellants' new jobs open for more than five months. On December 21, 2007, the District informed appellants in writing that their entitlement to paid leave would be exhausted "as of January 9, 2008," that their most recent doctors' notes extended their "unable to work" status beyond that date, and that they would be released from employment and placed on the 39-month reemployment list unless they obtained written releases from their doctors and returned to work before January 9, 2008.

Appellants never submitted medical releases and never returned to work. On January 8, 2008, the District's board of trustees approved appellants' separations from employment and placed them on the 39-month reemployment list (§ 88195).

Appellants obtained a right-to-sue letter from the Department of Fair Employment and Housing and sued the District on January 23, 2008.[3] A year later, claiming they had been "demoted" without notice and hearings and then terminated "for cause," appellants petitioned for a writ of administrative mandamus in the trial court to compel the District to reinstate them to their former positions or alternatively, to conduct hearings on the propriety of their "demotions, involuntary transfers, and terminations." The parties stipulated to consolidate the actions for a bifurcated trial, with the writ petition issues to be tried first.

After a bench trial, the court denied the petition. The court concluded that since neither appellant had been reassigned to an "inferior position or status," the reassignments were not "demotions" (§ 88001, subd. (d)) or "disciplinary actions" (§ 88001, subd. (e)) triggering notice and hearing rights under section 88013, subdivision (c). Nor did the reassignments offend due process, because appellants enjoyed no property rights in their specific former assignments.

The court determined that appellants "were not terminated for cause, but because of their inability (per doctor notices) to return to work and all

---

[3] Although the third amended complaint is not included in the record on appeal, the trial court described it as alleging wrongful demotion and constructive discharge, discharge without due process, discharge in violation of Government Code section 12940, and discharge in violation of the whistleblower provisions of Labor Code section 1102.5.

accrued sick leave had been exhausted." "While the motion before the Hartnell Board stated that the petitioners were terminated because of 'the inability, abandonment, and/or refusal to resume' their duties, actually, the Petitioners had 'abandoned and/or refused to resume' their newly assigned duties long before January 8, 200[8], and the Court so finds." The court concluded that because appellants' separations from employment were not "for cause," they were not "[d]isciplinary action[s]" (§ 88001, subd. (e)) triggering notice and hearing rights under section 88013, subdivision (c).

After a posttrial hearing on the remaining causes of action,[4] the court entered judgment for the District. Appellants filed a timely notice of appeal.

## II.   Discussion

### A.   Standard of Review

"In reviewing a trial court's judgment on a petition for writ of ordinary mandate, we apply the substantial evidence test to the trial court's factual findings." (*Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 53 [80 Cal.Rptr.2d 137] (*Kreeft*).) Under the substantial evidence test, " ' "[w]e must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.] We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings. [Citation.]" ' " (*Lake v. Reed* (1997) 16 Cal.4th 448, 457 [65 Cal.Rptr.2d 860, 940 P.2d 311] (*Lake*).) "[W]e exercise our independent judgment on legal issues, such as the interpretation of statutory . . . provisions." (*Kreeft*, at p. 53.)

In this case we are called upon to interpret certain definitions in the Education Code. " 'The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, the court may examine the

---

[4] The parties stipulated that in lieu of proceeding on the remaining causes of action, the court could rule on them based on evidence presented at trial and appellants' offer of proof at a posttrial hearing. The court ruled in favor of the District, explaining that, given its determination that appellants' temporary reassignments were not demotions, "there is . . . a very serious failure of proof regarding the other causes of action. [¶] The Court does find . . . that there is insufficient evidence to sustain the plaintiffs' burden of proof. And the Court finds in favor of the defendants on each cause of action."

context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citations.]' [Citation.] ' "When the language is susceptible of more than one reasonable interpretation . . . , we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' [Citation.]" (*People v. Jefferson* (1999) 21 Cal.4th 86, 94 [86 Cal.Rptr.2d 893, 980 P.2d 441] (*Jefferson*).) "Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*People v. Sinohui* (2002) 28 Cal.4th 205, 211–212 [120 Cal.Rptr.2d 783, 47 P.3d 629].)

### B. The Temporary Reassignments Were Not "Demotions"

"At the heart of this case," appellants contend, is the trial court's too narrow construction of section 88001, which states, in subdivision (d), that " 'Demotion' means assignment to an inferior position or status without the employee's written voluntary consent." (§ 88001, subd. (d).) They claim the court erred in determining that their temporary reassignments "did not constitute 'demotions'—notwithstanding its simultaneous finding that the new positions conferred less 'prestige' than their original positions." Appellants claim that error engendered further error: the "mistaken" conclusion that since the temporary reassignments were not "demotions," appellants had not been subjected to "disciplinary action" and were therefore not entitled to prereassignment notice and hearings.

In urging their respective constructions of the statutory definition of "demotion" ("assignment to an inferior position or status without the employee's written voluntary consent"), neither side directly addresses the meaning of "position" or "status." (§ 88001, subd. (d).) Nor does either side explain the difference between the concepts each word connotes. In failing to squarely address the meaning of the particular words the Legislature chose, the parties run afoul of the principle that every word of a statute must be given "some significance, leaving no part useless or devoid of meaning." (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) "In using two . . . different terms . . . the Legislature presumably intended to refer to two distinct concepts." (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 55 [19 Cal.Rptr.2d 73, 850 P.2d 621].) We will address them separately.

### 1. "Position"

The statute does not define "position," and its meaning has not been specifically addressed by the courts. Common dictionary definitions of "position" reveal that the "usual, ordinary meaning[]" of the word (*In re Reeves* (2005) 35 Cal.4th 765, 770 [28 Cal.Rptr.3d 4, 110 P.3d 1218]) is "a post of employment; a job," or more specifically, "the group of tasks and responsibilities making up the duties of an employee . . . ." (American Heritage College Dict. (3d ed. 1997) p. 1067; Webster's 3d New Internat. Dict. (1993) p. 1769.) Courts' general usage of the word in the case law are consistent with these definitions. (See *Barthuli v. Board of Trustees* (1977) 19 Cal.3d 717, 719 [139 Cal.Rptr. 627, 566 P.2d 261] (*Barthuli*) ["Petitioner held the position of associate superintendent of business . . . ."]; *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 337, fn. 4 [33 Cal.Rptr.2d 109, 878 P.2d 1321] ["Teachers, librarians, and counselors are examples of those in academic positions."]; *Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 166, fn. 2 [95 Cal.Rptr.2d 10] ["The wage order does not specifically include administrative assistants, the most recent position held by Kim . . . ."].)

Viewing the word in the context of the statute as a whole (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487 [30 Cal.Rptr.3d 823, 115 P.3d 98]) allows us to further refine what the Legislature intended by "position." The definition of "classification," for example, states that " '[c]lassification' means that each position in the classified service shall have a designated title, a regular minimum number of assigned hours per day, days per week, and months per year, a specific statement of the duties required to be performed by the employees in each such position, and the regular monthly salary ranges for each such position." (§ 88001, subd. (a).)

We think it follows that a position with a lower classification is an "inferior position" within the meaning of section 88001, subd. (d). (See, e.g., *Spanner v. Rancho Santiago Community College Dist.* (2004) 119 Cal.App.4th 584, 587–588 [15 Cal.Rptr.3d 1] [chief custodian demoted to custodian].) But "assignment to an inferior position" must connote more than a reduction in classification; otherwise, the Legislature would have used the word "classification" instead of the word "position."

Appellants contend there can be a demotion in the *type* of position even where the salary remains the same. (See *Reed v. City Council of City of Roseville* (1943) 60 Cal.App.2d 628, 636 [141 P.2d 459] (*Reed*).) Relying on *Reed* and a variety of federal cases that do not address the meaning of "inferior position" or "demotion" under California's Education Code, they

argue that an inferior position is one that has "a less distinguished title" or involves "significantly diminished material responsibilities."[5]

In our search for what the Legislature meant by "position" (and "inferior position"), we find *Reed* more helpful than the federal cases appellants cite.[6] In *Reed*, a housing and sanitation inspector challenged his reassignment to the position of special police officer, arguing that it violated the city personnel board's rule allowing transfers between civil service positions " 'in the same or comparable class' " but disallowing transfers used to effectuate promotions or demotions. (*Reed, supra*, 60 Cal.App.2d at p. 630.) The trial court ordered the petitioner restored to his former position, and the Court of Appeal affirmed. The appellate court compared the qualifications and duties of the

---

[5] Appellants also argue that "significant changes in the nature and types of interactions the employee is likely to have with colleagues and others" can signify an inferior position. But the case they cite does not support their argument. In *Finot v. Pasadena City Bd. of Education* (1967) 250 Cal.App.2d 189 [58 Cal.Rptr. 520] (*Finot*), the court held that a teacher's reassignment from classroom to home teaching, solely because he wore a beard, deprived him of a personal liberty interest protected by the Fourteenth Amendment. (*Finot*, at p. 202.) He suffered "a legally remediable detriment" because, although his rank and pay remained the same, his workload increased sevenfold, and he had only limited contact with other faculty members, whose "rather constant company" he had enjoyed in his previous position. (*Id.* at pp. 202–203.) *Finot* does not support the assertion that changes in the nature and types of interactions an employee is likely to have can, without more, signify an inferior position.

[6] The federal cases appellants cite do not advance their position because those cases apply different statutes to different factual situations. In *Crady v. Liberty National Bank and Trust Co.* (7th Cir. 1993) 993 F.2d 132 (*Crady*), the court rejected a former assistant vice-president's Age Discrimination in Employment Act of 1967 (ADEA; 29 U.S.C. § 621 et seq.) claim, noting that where salary and benefits remain the same, a change in employment "must be more disruptive than . . . an alteration of job responsibilities" and a title change from assistant vice-president to loan manager. (*Crady*, at p. 136.) In *Kocsis v. Multi-Care Management, Inc.* (6th Cir. 1996) 97 F.3d 876 (*Kocsis*), the court rejected an Americans with Disabilities Act of 1990 (ADA; 42 U.S.C. § 12101 et seq.) claim by a former nursing supervisor reassigned to the position of unit RN (registered nurse) because of poor performance. She claimed she had been "demoted" because of her health problems to a position that was "much more physically demanding." (*Kocsis*, at pp. 879–880.) But her pay and benefits had remained the same, and her new position was "very similar, differing only in the number of patients and employees for whom [she] was responsible." (*Id.* at p. 879.) The court of appeals affirmed summary judgment for the employer, holding that the plaintiff had failed to establish a materially adverse employment action. (*Id.* at p. 885 ["reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination cases"].) In analyzing the "materially adverse change" issue, the court reviewed a number of ADEA and title VII cases that had rejected similar claims. (*Kocsis*, at pp. 885–886; see, e.g., *Flaherty v. Gas Research Institute* (7th Cir. 1994) 31 F.3d 451, 457 [semantic change in title and a "bruised ego" not enough where pay and benefits remained the same].) In *Burlington Industries, Inc. v. Ellerth* (1998) 524 U.S. 742 [141 L.Ed.2d 633, 118 S.Ct. 2257] (*Burlington*), a title VII case, the United States Supreme Court explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (*Burlington*, at p. 761.) "[I]n most cases[, it] inflicts direct economic harm." (*Id.* at p. 762.)

two positions, found them "markedly dissimilar," and concluded that the positions were "neither of the same nor of a comparable class." (*Reed*, at p. 635.) It was "obvious that the transfer complained of effected a demotion," because although both positions paid the same salary, and "it may appear that one qualified to perform the duties of housing and sanitation inspector is qualified to perform the duties of special police officer, yet *if the situation be reversed*, the lack of qualification of the latter to perform the duties of the former instantly appears, and compels the conclusion that petitioner's transfer did effect a demotion." (*Reed*, at pp. 635–636, italics added.)

In our view, *Reed* provides a useful metric for objectively assessing when reassignment to a position with the same classification, title,[7] salary, and benefits is an assignment to an "inferior position" or, in other words, a demotion. We think such situations will rarely be demotions. But if, after a comparison of the qualifications and/or duties of the two positions (A and B), it "instantly appears" that a person qualified to perform the duties of position A would not be qualified to perform the duties of position B, then position A is, in our view, the inferior one. (See *Reed, supra*, 60 Cal.App.2d at pp. 635–636.)

Here, the trial court in essence applied this analysis. After considering all of the evidence adduced at trial, including the written job descriptions, the court concluded that appellants had not been assigned to inferior positions. Our review of the record finds substantial evidence to support the court's determination.

Given the allegation in their writ petition that their former positions had been "filled by considerably younger *and less qualified employees*" and given their reliance on *Reed*, we would have expected appellants to adduce evidence at trial showing that the vice-presidents' assistants who assumed those positions had struggled to perform their duties in the office of the superintendent/president. (Italics added.) The record is devoid of any such evidence, which suggests that the positions were similar.

---

[7] Although appellants' briefs repeatedly characterize Lawrence's former title as "Senior Executive Assistant *to the President-Superintendent*" (or "Senior Executive Assistant *to the President*") and Culver's as "Executive Assistant *to the President-Superintendent*," and suggest their new titles were "Senior Executive Assistant *to the Vice President of Academic Affairs*" and "Executive Assistant *to the Vice President of Student Services*," we find substantial evidence in the record to support the conclusion that their titles (senior executive assistant for Lawrence and executive assistant for Culver) did not change. (Italics added.) Dr. Helm testified that appellants' titles remained the same; she did not agree with the statement that Lawrence's title was senior executive assistant *to the president*. The written job descriptions describe the positions of "executive assistant" and "senior executive assistant." As Lawrence herself explained, "I applied for the senior executive assistant position." "I was the senior executive assistant, and I worked in the Office of the President." Thus, we need not and do not determine under what circumstances a title change might connote an inferior position.

Dr. Helm testified that appellants would have done "very much the same kind of work" in their new positions. "[T]he work includes managing calendar[s], setting meetings, interaction with the public, handling anything as mundane as filing to making judgments about priorities for the person for whom you are working." The written job descriptions for the senior executive assistant and executive assistant positions, while not identical, bolster Dr. Helm's statement: both describe standard secretarial and administrative support duties.

Appellants testified that the responsibilities of their former positions were "well above" the routine tasks they would have been relegated to in their new assignments working for District vice-presidents. When asked to identify specific "concrete differences" between their former and new assignments, however, they were unable to do so. Although Culver complained that in her new assignment, she would no longer "deal with vice-presidents on the campus and then you go to local, national, state, international levels," she conceded on cross-examination that the vice-presidents' assistants also dealt with local, state, and national government entities. Lawrence similarly conceded that assistants to the vice-presidents, just like assistants to the superintendent/president, interacted with deans, faculty, directors, and managers, and also had contact with boards of hospitals, agricultural companies, and the like. Appellants also acknowledged that the vice-presidents' assistants had duties above and beyond those expressly spelled out in the written job descriptions. Those tasks were encompassed by a general statement at the end of the job descriptions: "Perform related duties as assigned."

Given this evidence, the trial court could reasonably have discredited appellants' assertions that they had been reassigned to "inferior position[s]" that "involved significantly *less* responsibility."

## 2. "Status"

Appellants equate "status" with prestige. " 'Inferior status,' " they assert, "clearly encompasses changes such as . . . a lower prestige position dealing with persons or groups lower in the College hierarchy." The District, on the other hand, suggests that "status" refers to classifications such as full-or part-time, permanent or at will.

"Status" is not defined in the Education Code,[8] and we have found no case authority addressing its meaning. The American Heritage College Dictionary

---

[8] The identical definition of "demotion" ("assignment to an inferior position or status without the employee's written voluntary consent") appears in section 45101, but neither "demotion" nor "status" has been construed in connection with that statute. (§ 45101, subd. (d).)

defines "status" as "1. Position relative to that of others; standing. 2. High standing; prestige." (American Heritage College Dict., *supra*, p. 1328.) Similarly, Webster's Third New International Dictionary defines "status" as "2 a : position or rank in relation to others (as in a social order, community, class, or profession) . . . b : relative rank in a hierarchy of prestige . . . ." (Webster's 3d New Internat. Dict., *supra*, p. 2230.) Thus, common usage suggests that the word is reasonably susceptible of both interpretations the parties offer.

▪ Where the plain language of a statute is ambiguous, we look to the context in which it appears. (*Jefferson, supra*, 21 Cal.4th at p. 94.) "Words used in an ordinary sense in one part of an enactment are to be construed in the same sense in another in the absence of express definition." (*Shorb v. Barkley* (1952) 108 Cal.App.2d 873, 877 [240 P.2d 337].) Here, the sense in which the Legislature uses "status" in other parts of the statute lends support to the District's interpretation of the word. In the subdivision immediately preceding the definition of "demotion," for example, the statute provides that, " 'Regular,' as used in the phrase 'regular classified employee,' or any similar phrase, refers to a classified employee who has *probationary or permanent* status." (§ 88001, subd. (c), italics added.) Other provisions refer to "paid status" (§§ 88002, subd. (a), 88165, 88197), "permanent status" (§§ 88005.1, 88008, 88079, 88091), "involuntary leave status" (§ 89536.1, subd. (b)), and "regular status in a full-time position" (§ 88076). Additionally, section 88120 distinguishes regular from probationary status. (§ 88120.) These usages lend support to the District's objective interpretation. We find nothing in the context of the statute to support appellants' subjective interpretation.

▪ We have examined the legislative history of section 88001, but it contains no clues to what the Legislature meant by "status." (*Jefferson, supra*, 21 Cal.4th at p. 94.) Therefore, we consider public policy. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1084 [36 Cal.Rptr.3d 650].) "[W]e apply 'reason, practicality, and common sense to the language at hand.' [Citation.] The words of the statute should be interpreted 'to make them workable and reasonable.' [Citation.] We will also consider the consequences that will flow from a particular statutory interpretation. [Citation.]" (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 583 [48 Cal.Rptr.3d 340].)

Overwhelming public policy as well as practical considerations make it highly unlikely, in our view, that the Legislature intended to give "status" the subjective interpretation appellants advance here. As becomes immediately apparent, such a nebulous standard is no standard at all. Were we to adopt appellants' standard, any classified employee could demand notice and a hearing upon being transferred to a position he or she in some subjective

sense deemed less prestigious, even if his or her classification, title, salary, and benefits remained the same. An assistant to the vice-president of business services could object to a lateral transfer to the office of the vice-president of student services, arguing, as Culver did, that working with students is far less prestigious than interacting with executives. How would a hearing officer or a court, faced with conflicting testimony from Dr. Helm that "[f]rom my perspective, the only business we're in is teaching and learning, and that always makes the Office of Instruction the most important office in the college," decide such a claim? Whose subjective viewpoint should prevail? The standard appellants urge would be unenforceable.

Appellants' standard would also deny school management the flexibility it needs to address staffing issues, replacing that flexibility with distracting and costly administrative procedures and litigation. It would have repercussions far beyond a school district's executive offices, because the classified service " 'include[s] custodians, bus drivers, cafeteria workers, clerical staff, some instructional aides, and other nonteaching and nonadministrative positions.' " (*Seymour v. Christiansen* (1991) 235 Cal.App.3d 1168, 1176–1177 [1 Cal.Rptr.2d 257].) Since the identical definition of "demotion" appears in the sections governing classified employees of elementary and secondary school districts, it would affect those districts as well. (§§ 45101 et seq., 45101, subd. (d).) We do not believe the Legislature intended such an absurd interpretation.

■ These considerations lead us to conclude that the Legislature intended "status" to refer to objectively ascertainable indicators that establish an employee's standing relative to that of other employees. Examples include full-time versus part-time and confidential[9] versus nonconfidential. This is not an exhaustive list, but it is sufficient to illustrate the stark difference between objectively ascertainable indicators of "status" and the highly subjective indicators that appellants urge us to adopt. We reject appellants' contention that "status" means prestige.

The cases on which appellants rely do not change our conclusion. In *Lynch v. McNamara* (D.Conn. 2004) 342 F.Supp.2d 59 (*Lynch*), the court held that a police sergeant did not have a protected property interest in remaining a member of Connecticut's Statewide Firearms Trafficking Task Force. Even assuming that he did, he was not deprived of that interest where he voluntarily left the task force before a disciplinary transfer and, after successfully grieving the discipline, obtained a settlement redesignating it as administrative. (*Id.* at p. 64.)

---

[9] A " '[c]onfidential employee' " includes one "whose duties normally require access to confidential information that is used to contribute significantly to the development of management positions." (Gov. Code, § 3540.1, subd. (c).)

*Lynch* is not, as appellants claim, a case in which "the court determined whether there had been a change in 'rank' by comparing 'prestigiousness' of the employee's new duties with the 'prestigiousness' of his former duties." The *Lynch* decision did not turn on prestige. As the court explained, "reassignments and transfers generally do not implicate a protected property interest for the purposes of due process, *unless accompanied by a loss in pay.*" (*Lynch, supra*, 342 F.Supp.2d at pp. 65–66, italics added.) Not only was there no loss of pay in *Lynch*, the court continued, but the plaintiff retained "his rank of sergeant, his base pay, normal union steps in pay raises and obtained even more prestigious positions after the transfer." (*Id.* at p. 64, fn. omitted.)

Appellants also cite *Kocsis*, asserting that "[r]eassignments have . . . been considered 'demotions' when they have involved a loss of *'prestige in [the employee's] position because of her working conditions or her title change.'* " But the plaintiff in that ADA case did not claim a loss of prestige. (*Kocsis, supra*, 97 F.3d at pp. 886–887.) *Kocsis* does not help appellants.

■ Appellants' reliance on title VII cases is similarly misplaced. The fact that job prestige may be relevant in some circumstances does not mean it is relevant in entirely different circumstances. Even in the title VII context, moreover, "an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause . . . ." (*Davis v. Town of Lake Park, Fla.* (11th Cir. 2001) 245 F.3d 1232, 1245; accord, *Maclin v. SBC Ameritech* (7th Cir. 2008) 520 F.3d 781, 789 ["a change in title that deprives an employee of prestige is insufficient if it lacks more substantive effect"].)

■ The trial court correctly concluded that appellants' reassignments were not "demotions" or "disciplinary actions" triggering notice and hearing rights.

### 3. Due Process

Appellants claim the District's failure to afford them prereassignment notice and hearings violated their rights to due process, since they had a property interest in their former positions. We disagree.

■ California's statutory scheme governing civil service employment gives state employees who attain "permanent" status a property interest in continued employment that cannot be denied without due process. (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206–207 [124 Cal.Rptr. 14, 539 P.2d 774] (*Skelly*).) But as the United States Supreme Court has

explained, "the range of interests protected by procedural due process is not infinite." (*Board of Regents v. Roth* (1972) 408 U.S. 564, 570 [33 L.Ed.2d 548, 92 S.Ct. 2701] (*Roth*).) "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." (*Roth*, at p. 577; see *Skelly*, at pp. 206–207.)

"Property interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (*Roth, supra*, 408 U.S. at p. 577; see *Skelly, supra*, 15 Cal.3d at p. 207.) "It is the state . . . that defines the substantive nature of the property interest." (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1117 [278 Cal.Rptr. 346, 805 P.2d 300] (*Coleman*).) "The statutory terms that define a particular right to employment determine its dimensions and scope." (*Id.* at p. 1114.)

The Education Code gave appellants a property interest in continued employment. (§§ 88121, 88001, subds. (d), (e), (h).) "In a practical sense a permanent employee's property interest in continued employment embraces his current classification as well as his current salary." (*Ng v. State Personnel Bd.* (1977) 68 Cal.App.3d 600, 606 [137 Cal.Rptr. 387].) That property interest is damaged by demotion as well as by dismissal: "The latter deprives him of the entire interest, the former of part." (*Ibid.*) Here, there was no loss of a property interest created by statute because, as we have already concluded, appellants' reassignments did not constitute "demotions" within the meaning of section 88001, subdivision (d). Nor have appellants identified any other basis affording them the right to prereassignment notice and hearings. As the trial court expressly found, "[n]o Hartnell Board Policy provides a right to notice and a hearing for a transfer of a confidential classified employee." Appellants do not challenge that finding on appeal. Moreover, "[i]t is well established that an employee enjoys no fundamental or vested right to continuation in a particular job assignment." (*Dobbins v. San Diego County Civil Service Com.* (1999) 75 Cal.App.4th 125, 131 [89 Cal.Rptr.2d 39].) Appellants' due process challenge fails.

## C. Separations from Employment[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 687.

## III. Disposition

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.

A petition for a rehearing was denied May 12, 2011, and appellants' petition for review by the Supreme Court was denied July 13, 2011, S193411.